## ALEXANDER KILGOUR *vs.* THE EVENING STAR NEWSPAPER CO.

*Libel—Criticism of a Public Officer When Libelous per se—Charges*
*Not Relating to Duties of Officer—Innuendo.*

A publication criticising the conduct of a public officer, such as a State's Attorney, is not libelous *per se* unless it imputes lack of integrity or corrupt motives to him, or charges him with incapacity or unfitness for the office.

It is a question of law for the Court whether the innuendo in a declaration for libel is fairly warranted by the language used.

The publication must be considered as a whole in order to ascertain if it is libelous *per se*.

An article in defendant's newspaper narrated that a baby had died at a certain place under suspicious circumstances ; that the coroner and State's Attorney had been notified and the latter ordered the arrest of

the mother of the child; that about the time appointed for an inquest the State's Attorney met the physician who had seen the baby soon after its death, and the State's Attorney then informed the sheriff that if an autopsy was held he would refuse to recommend the payment of the bill for expenses and that he afterwards directed the mother of the child to be released from custody; that a certain named man had denounced this conduct as an outrage on the part of the State's Attorney, and that many citizens were agitated on account of the alleged stifling by him of an investigation of a mysterious death. In an action of libel by the State's Attorney, *held*, upon demurrer to the declaration, that this publication is not libelous *per se* since it does not contain any injurious reflection upon the motives or capacity of the plaintiff as State's Attorney, or allege that he corruptly perverted the course of justice by stifling a prosecution, but the reasonable inference from the publication is that after consultation with a physician the State's Attorney deemed an inquest unnecessary.

Criticism of the conduct of a public officer in matters outside the scope of his public duties does not touch him as an officer and is not actionable defamation, unless it contains words actionable *per se* when relating to a private person or there is proof of special damage.

A State's Attorney has no power or duty to regulate the expenses of a coroner holding an inquest, and consequently a publication charging that a State's Attorney announced that if a certain autopsy were held he would not recommend the payment of the coroner's fees, does not affect the State's Attorney in his official capacity, but only as a private person.

A count in the declaration set forth the alleged libel to the effect that the plaintiff, the State's Attorney of the county, appeared at a hearing held by a Justice of the Peace, to investigate the mysterious death of a child and announced that he would not recommend the payment of any expenses incurred in making an autopsy, and that the proceedings were a little later brought to a close; and the count then set forth the following innuendo; meaning thereby that the plaintiff wantonly, wilfully, corruptly and by malfeasance in the discharge of his official duties as State's Attorney stifled and prevented all proper inquiry as to the cause of the death of a two-months-old child and thereby perverted the ends of justice. *Held*, that this innuendo, not being supported by a *colloquium*, cannot be taken to expand or alter the natural meaning of the words actually used, and that since these words are not actionable *per se*, this count is bad upon demurrer.

Appeal from the Circuit Court for Montgomery County (McSHERRY, C. J., HENDERSON and MOTTER, JJ.)

The cause was argued before FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.)

*W. V. Bouic* and *E. C. Peter*, for the appellant.

Assuming the statement of the article to be true, it was the duty of the State's Attorney to see that an inquest was held ; to give the justice and the deputy sheriff, in the course of the investigation, the full benefit of the skill and experience, which as State's Attorney he should have possessed ; to cause Bessie Sellman to be held until the mystery was cleared up ; and, if the investigation disclosed probable cause to believe a murder had been committed, to use his best efforts to bring those to whom the evidence pointed as the guilty ones to trial.    If such was his duty and he appeared at the time and place set for the purpose of having the inquest proceed, and almost immediately after his arrival, without any apparent cause or deigning any explanation, abandoned the case, and by a threat which may have been impotent, but which proved effective, prevented those it was his duty to assist and encourage, from proceeding with an investigation it was their duty to pursue, and then stretched his authority beyond its limits to hastily free from jail one properly committed to await the investigation of a suspected murder, he was justly liable to the charge of having *stifled*, using the words in the offensive sense in which it is ever used when applied to official conduct, the investigation of the mysterious death of Bessie Sellman's baby.

If, by assuming the facts set forth in the article to be true, it so clearly points to official misconduct and incapacity, it must follow, when the appellee, by its demurrer, admits that those facts are false, that the article " tended to injure " Mr. Kilgour.   " Any publication which *tends* to injure one's reputation, and expose him to hatred or contempt, if made without lawful excuse, is libelous."   *Negley* v. *Farrow*, 60 Md. 175.

It is a familiar principle that words not actionable without proof of special damage may become so if spoken of one engaged in a particular calling or profession ; the rule being that any words spoken of a person in his office, profession, etc., which tend to expose him to the hazard of losing his office, or which charge him with incapacity, and thereby tend to injure him in his profession, are actionable without proof of special damage.   18 *Am. & Eng. Ency. of Law* (2nd ed.) 942.

*Ashley M. Gould*, for the appellee.

The article published must be taken as a whole.   When so considered it does not impute to plaintiff general incapacity to perform the duties of his office.   His action as narrated involves no official misconduct and no bad or corrupt motives, being the recital of baseless criticism upon the exercise of his official judgment ; hence it is not libelous *per se*.   Any caustic comments upon plaintiff's action are nullified by the full statement of the facts upon which said comments are based, and these facts demonstrate the propriety of the plaintiff's action and the lack of foundation of the criticism on it.   *Sillars* v. *Collier*, 151 Mass. 50; *Townshend on Libel and Slander*, sec. 192; *Odgers on Libel*, 65.

From these authorities it is deducible that language touching one in his office, to be actionable *per se*, must either— *First*. Impute to him general incapacity to perform the duties of his office (and, this must be a charge of *general* incapacity, and not incapacity in a particular transaction); or *Second*. Impute to him positive past misconduct which will injuriously affect him in his office ; and this imputation of misconduct must be more than mere criticism, however severe, of his official act ; it must go to the extent of charging bad or corrupt motives as inspiring those acts.

This necessity that the language, to be actionable *per se*, must contain an imputation of bad or corrupt motive is recognized in all the cases.   It is the dividing line between criticism and defamation.   *Campbell* v. *Spootswood*, 3 Fost. & F., 421 (32 L. J. Q. B., 185); *Neeb* v. *Hope*, 111 Pa. St. 153; *Baldwin* v. *Walser*, 41 Mo. App. 243; *Robbins* v. *Treadway*, 2 J. J. Marshall (Ky.) 540; *Negley* v. *Farrow*, 60 Md. 158; *Shattuck* v. *Allen*, 4 Gray, 540.

A newspaper may comment on the conduct of magistrates in dismissing a case without hearing the whole of the evidence or in committing the prisoner for trial on insufficient evidence, but it must not impute that in so doing they acted deliberately and consciously from political motives.   *Hibbins* v. *Lee*, 4 F. & F. 243.

Applying this test to the publication concerning plaintiff, it is respectfully submitted that no language can be found therein affecting him which, under any reasonable or natural construction of it, can be held to charge him with conduct involving base, improper, or corrupt motives. It refers to his "alleged stifling" of an inquest into the cause of death of an infant, and states that certain local officials and citizens were of the opinion that his action in so doing was an outrage. The article itself expresses no opinion upon the subject. The persons who are stated to have criticized his action do not in any way suggest, directly or indirectly, that his motive in so doing was improper or corrupt. There is no epithet applied to his act which, by any fair construction, can be considered libelous *per se*. The word "stifle" has no sinister or base meaning.

Moreover, even if single words or isolated sentences in the article could be distorted into a charge of personal corruption or misconduct on the part of plaintiff, the article taken as a whole fully explains and qualifies such expressions so as to exonerate plaintiff from any suspicion of misconduct, and it is thoroughly established in the law of defamation that "however positive may be the charge, if it is accompanied with words which qualify the meaning and show to the bystanders that the act imputed is not criminal, this is no slander, since the charge, taken together, does not convey to the minds of those who hear it an imputation of criminal conduct. Thus, t would not be slanderous *per se* to say : 'He is a thief; he has stolen my land;' land not being the subject of larceny, and one part of the charge being relieved of its criminal character by the other." *Cooley on Torts*, 199.

The same rule applies in cases of libel. *Gaither* v. *The Advertising Co.*, 102 Ala. 458; *Donahue* v. *Gaffey*, 53 Conn. 43; *Perry* v. *Marr*, 1 R. I. 263; *Hollenbech* v. *Hall*, 103 Iowa, 214. In *Gaither* v. *The Advertising Co.*, *supra*, the language and innuendo are as follows : "Moreover, I have ascertained from the very best authority that Mr. Gaither (meaning the plaintiff) was 'fired' (meaning thereby that the plaintiff was dis-

charged) from the office of general manager, because of a heavy loss in the business of the office (meaning thereby that plaintiff was guilty of embezzlement as general manager of said Farmers' Alliance Exchange of Alabama)." ·

Inasmuch as plaintiff's conduct, which forms the basis of the criticism, was beyond the scope of his duties as State's Attorney, the alleged libel does not touch him in his office, and therefore he cannot recover.

The charge against plaintiff in the publication in question is that he stifled an inquest into the cause of the death of the child by refusing to "recommend the payment of any expenses incurred in making the inquiry." This appears in several parts of the article and is unquestionably the only act of plaintiff of which criticism by the white and colored residents and local officials of the community is predicated. This is the only thing in the article which can possibly be construed as a charge against him or as a criticism of him. It is now contended on behalf of appellee that even if the language criticizing this action of plaintiff could be held to be libelous *per se*, yet, inasmuch as it is no part of the legal duties of a State's Attorney in Maryland to recommend the payment of the expenses of an autopsy or inquest, the alleged libelous publication does not touch him in his office, and that therefore the declaration is obnoxious to a demurrer; for, as heretofore stated, damages are claimed only for injury to him in his official capacity.

There is no provision of law in this State which makes it the duty of a State's Attorney, or which gives him the power or authority, to interfere in any way with a coroner's inquest; nor is there any requirement of law that he shall recommend the expenses incurred by a coroner, or by a Justice of the Peace acting as coroner, in holding an inquest.

On the other hand, the coroner, or Justice of the Peace acting as coroner, is probably the most absolute and independent official known to the law. By statute in this State he may employ a physician to make an examination of a deceased person, fine him if he refuses to attend and make the

examination, and charge the expenses to the county.    Code,
Art. 22, secs. 4, 5 and 6.    He may lawfully order a *post-
mortem* examination without the consent of the family of the
deceased where death has followed an injury which seems to
him insufficient alone to produce death.    *Young* v. *College of
Physicians and Surgeons of Baltimore City*, 81 Md. 358.    He
may hold an inquest and issue a commitment on Sunday.
*Blaney* v. *State*, 74 Md. 153.    He may conduct an inquest in
the absence of the accused, and the latter is not entitled to be
represented by counsel.    *People* v. *Collins*, 20 How. Pr. 111;
*Cox* v. *Coleridge*, 1 B. & C. 37 (8 E. C. L. 17).    Even in the
absence of statute, he has power to order a *post-mortem* in
taking an inquisition of death, and for that purpose to em-
ploy an expert physician and charge the expense thereof to
the proper county or municipal authority.    Note to *Young* v.
*College of Physicians and Surgeons of Baltimore City*, *supra*,
reported in 31 L. R. A. 540.

There can be no question that the appearance of a prose-
cuting attorney at an inquest and his participation in the pro-
ceedings are purely matters of discretion on the part of the
coroner.    As said by the Court in *Blaney* v. *State*, *supra*, "an
inquest held by a coroner's jury, and the commitment by a
coroner or magistrate of an accused to jail, are rather minis-
terial than judicial acts."

If these propositions are correct, then plaintiff's action in
refusing to recommend payment of the expenses of an inquest
was outside the scope of his official duties, and criticism
of him in reference thereto is not actionable.    *Oram* v. *Frank-
lin*, 5 Blackford, (Ind.) 42;    *Van Tassel* v. *Capron*, 1 Denio,
250;    *Kinney* v. *Nash*, 3 N. Y. 177;    *Baldwin* v. *Walser*, 41
Mo. App. 243;    *Doyley* v. *Roberts*, 3 Bing., N. C. 384 (32 E.
C. L.);    *Ayre* v. *Craven*, 2 Adolph & Ellis, 2 (29 E. C. L. 23).

Statements regarding plaintiff in the publication merely
charge him with error of judgment in a single transaction, not
amounting to a general unfitness to perform the duties of his
office, and hence are not actionable.

Stating the proposition in another way, it is confidently

asserted that no case can be found in which any Court has held to be actionable a criticism of a single act of a man in his official capacity, not attacking his character generally, no special damage being alleged, and the charge not imputing crime or such gross misconduct as would necessarily amount to a charge of general incapacity and unfitness for office. *Mattice* v. *Wilcox*, 147 N. Y. 624; *Foot* v. *Brown*, 8 Johns, 64; *Camp* v. *Martin*, 23 Conn. 94; *Manire* v. *Hubbard et al.* (Mch. 15, 1901), Ky., 61 S. W. 466; *Gunning* v. *Appleton*, 58 How. Pr. 471; *Poe* v. *Doctor Mondford*, 2 Croke's Rep. 620.

PAGE, J., delivered the opinion of the Court.

This is an action for libel. The defendant interposed a demurrer which the Court sustained. The judgment being for the defendant, the plaintiff appealed.

The declaration contains three counts—the first and third set out parts of the alleged libelous publication, with certain innuendoes ; the second contains the entire article, but without *colloquium* or innuendo. No special damages have been pleaded ; and therefore the only question presented by the record, is, whether the publication is libelous *per se*. Whether this be so or not, is always on demurrer within the province of the Court ; and it is also " matter of law " whether an innuendo is fairly warranted by the language declared on. *Lewis* v. *Daily News Co.*, 81 Md. 472; *Avirett* v. *State*, 76 Md. 510; *Haines* v. *Campbell*, 74 Md. 158; *Negley* v. *Farrow*, 60 Md. 180.

The declaration charges that at the time of the publication the appellant was and still is a practicing attorney and the State's Attorney of Montgomery County, and that the publication was " of and concerning him in respect of his said profession as a practicing attorney and of his duties as State's Attorney." It is not contended that the words of the publication are libelous as against the appellant, otherwise than as they touch upon or have reference to his profession and his official position of State's Attorney. The rule of law applicable to a case of that kind, seems to be clear. "Words spoken

of a person in his office, trade, profession, business or means of getting a livelihood, which tend to expose him to the hazard of losing his office, or which charge him with fraud, indirect dealings or incapacity and thereby tend to injure him in his trade, profession or business, are actionable without proof of special damage, even though such words if spoken or written of an ordinary person, might not be actionable *per se*." 18 *Am. & Eng. Ency. of Law*, p. 942 (2nd ed.); *Wilson v. Cottman*, 65 Md. 197.

"The words must go so far as to impute to him some incapacity or lack of due qualification to fill the position, or some positive past misconduct which will injuriously affect him in it." *Sillars* v. *Collier*, 151 Mass. 50; *Newell on Defamation, Slander and Libel*, ch. 8, p. 178; *Townsend, Libel* and *Slander*, secs. 188, 189.

So this Court said in *Newbold & Sons* v. *The J. M. Bradstreet & Son*, 57 Md. 53 : "To say or publish of a merchant anything that imputes insolvency, inability to pay his debts, the want of integrity in his business, or personal incapacity or pecuniary inability to conduct it with success, is slanderous or libelous *per se* if without justification."

In *Richardson* v. *State*, 66 Md. 212, the Court citing from *Woodgate* v. *Ridout*, 4 Foster & Finlason, 223, said : "It is of essential importance the administration of justice should be open to discussion ; but that criticism must be fair and honest and not reckless and uncharitable ; and that anything beyond this, and which imputes corrupt motives to those who administer it, is an abuse of privilege." "If one goes out of his way to asperse the personal character of a public man and to ascribe to him base and corrupt motives he must do so at his peril, and must either prove the truth of what he says or answer in damages to the party injured." *Negley* v. *Farrow*, 60 Md. 158.

These principles, which are fully supported by authority, establish the proposition, that, in order to find the words of this publication libelous, we must be enabled to determine that they impute to the appellant as an attorney and State's Attor-

ney, some base or corrupt motive, or incapacity, in the discharge of the duties of such office; or, as stated by Newell, some "unfitness to perform" the duties of the office, or "want of integrity in the discharge of them." *Newell on Slander and Libel*, ch. 8; *Neeb* v. *Hope*, 111 Pa. St. 153–154; *Baldwin* v. *Walser*, 41 Mo. App. 243–254.

The publication was published in the "Evening Star," a newspaper printed in the city of Washington, and circulated in Montgomery County. Apparently, it is an ordinary news item, containing a statement of the circumstances attending the death and burial of a negro baby, of the suspicions concerning it that were aroused in the community where the events took place, and of the actions of the State's Attorney in connection therewith. It is not requisite that the whole article be reproduced here. It is long, and it will answer every purpose, if we state its general purport and then refer more particularly to those parts that are relied on by the appellant to show the libelous character of the publication. As set out in the second count of the declaration, the article states, that one Bessie Sellman had given birth to a child, no physician being present;—that the mid-wife, who officiated, told the reporter that it was healthy and that after seeing it some half-dozen times at intervals of probably a week, she predicted it would "grow up;" that on May 3rd, 'she was horrified to be told that a notice was tacked on a tree' to the effect that the baby was dead and that Henry Mason had buried it in Steven's lot." Some conversation between this woman and Henry Mason is then recited. The article then proceeds (in substance) to state, that the actions and language used by Mason led the reporter to watch near Mason's house, and he saw Mason's father-in-law come out of Mason's house with a spade and "go to the place said to be a grave" and dig up a box shaped like a coffin, which he carried away and buried (as the reporter afterwards learned) in Mason's yard. That he then reported the matter to the Justice of the Peace who consulted the appellant; that the latter told him to "issue warrants for the arrest of everybody suspected of

having anything to do with the affair and commit them to the Rockville jail. " The justice however issued a warrant only for the arrest of the mother who was committed to jail for a hearing. That the remains of the baby were disinterred "with the idea that an autopsy was to be made" and in compliance with his request the State's Attorney was notified. "The latter Mr. Thompson said, reached Gaithersburg about the hour appointed for the inquest to begin, and *almost at once, supposedly by appointment met Dr. McCormick, who saw the baby soon after its death.* A conversation between the doctor and the State's Attorney followed and at its termination, Mr. Kilgour informed Deputy Sheriff Thompson and Justice Baughman, that if an *autopsy was* held he would refuse to recommend the payment of the bill for the expenses, with the result stated. The State's Attorney went back to Rockville soon afterwards, and ordered the immediate release of Bessie Sellman from jail, which order was obeyed." That the body was reinterred. It is then stated that this action of the State's Attorney produced mingled feelings of indignation and resentment on the part of white and colored residents ; also what Mr. Thompson had to say about it, to the effect, that "he denounced it as an outrage on Kilgour's part ;" had it been a white man who was charged, &c., he would in all probability have been strung up to one of the trees, &c., and that he intended "to leave no stone unturned to sift the whole affair ;" and further that the Justice of the Peace expressed "similar views," &c.

We do not find in this long publication, a fair outline of which we have given, any imputation whatever upon the motives or capacity of the State's Attorney. There is apparent a strong feeling on the part of Thompson, that there should have been a fuller investigation ; though it does not appear he knew what it was, that had been communicated to the State's Attorney by Dr. McCormick. The article states that he, Thompson, denounced the transaction as an "*outrage*" on Kilgour's part. But the word "outrage" was used immediately succeeding the statement of what Mr. Kilgour's

part really was ; and if that statement does not impute cor-
rupt motives to him, Mr. Thompson's harsh word is of no
avail.   The charge, that he had committed an outrage, would
not then be slanderous, because of the fact, that it is accom-
panied with words that qualify the meaning, that might other-
wise be attached, to it, and show that the act imputed, was
not in fact an outrage, nor one that reflected adversely upon
the character or motives of the officer.

In the opening sentences of the publication, it is stated that
many prominent citizens were greatly agitated, "on account of
the alleged *stifling* by the State's Attorney of an investigation
of the mysterious death, &c.," and it is insisted that the word
"stifling" was used in its offensive sense, and implied that the
State's Attorney acted from corrupt motives.   But we cannot
accept this view if the whole article be considered, as must
be done if we are to arrive at the true meaning and force of
particular words or phrases.   It is not proper to separate
words or phrases from the context.   All parts of the paper
should be read in connection, to collect their true meaning.
*Gaither* v. *The Advertising Co.,* 102 Ala. 458; *Donaghue* v.
*Gaffy,* 53 Conn. 43; *Am. & Eng. Ency. of Law,* 2nd ed.,
vol. 18.

Now almost in the same connection in which the words
"alleged stifling" occur, we are told how the stifling was ac-
complished, viz. the State's Attorney "announced he would
not recommend the payment of any expenses incurred in
making the inquiry."   And later on it is stated, that he made
this announcement at the termination of a conversation be-
tween the State's Attorney and Dr. McCormick "who saw
the baby soon after its death."   So that the charge of
"stifling" as explained in the article, means nothing more,
than that the State's Attorney after he had had a consultation
with the physician who had seen the baby soon after its death,
announced he would not recommend the payment of the ex-
penses if the inquest was held.   There is no imputation here
that the State's Attorney was actuated by corrupt motives ;
on the contrary it would seem to be a reasonable inference

from the statement, that after the consultation with the phy-
sician, he deemed an inquest unnecessary, and therefore would
decline to recommend the payment of the expenses.

Another statement in the article, which is relied on by the
appellant to show its libelous character, is, that in which the
State's Attorney is "reported to have said; I want you, as
soon as you go back, to issue warrants for the arrest of every-
body who is suspected of having anything to do with this
affair and commit them to the Rockville jail." But we cannot
think this imputes anything to the detriment of the official
character of the appellant. If there were reasonable grounds
of suspicion against persons, it was highly proper that they
should be brought before the magistrate, and their supposed
crime investigated. It certainly could not detract from the
official reputation of the State's Attorney, that he desired that
all suspected persons should be secured and retained until their
probable complicity with the crime could be examined into.
It was not a "wholesale arrest of citizens" that he advised,
but such as were only suspected of having anything to do with
the crime. If there were any properly suspected, they should
have been arrested.

But without prolonging this opinion with a further discussion
of the article, we may say, that after a careful examination of
its statement, we are of opinion that it is not libelous either in
its entirety or any of its parts.

Aside from all we have said, so far, there is another matter
that forces itself on our attention. Whatever may be held as
to the character of the publication, can any of its statements
touch the appellant as State's Attorney? The *narr.* charges
that they were printed and published of and concerning him
in respect of his profession "as a practicing attorney and of
his duties as State's Attorney." If the appellant in his actions
before the Justice of the Peace, was not within the authority
of the office of State's Attorney, he must be viewed as a pri-
vate person only, and a charge that he was then actuated by
corrupt motives would only touch him personally, and the
words could not in such case be actionable *per se* on the theory

that it touched him in his office.   In *Ayre* v. *Craven*, 2 Adolp & El. 2, it was held that the scandalous conduct imputed to the plaintiff in his profession must "be connected by the speaker with that profession."   Words not *per se* actionable, will not be ground for an action " though spoken of one who holds an office   *   *   unless they are spoken of and touch him in his office."   *VanTassel* v. *Capron*, 1 Denio, 252.   And in *Baldwin* v. *Walser*, 41 Mo. App. 251, it was said the language " must touch him " in that special character or relation   *   * It is not sufficient that the language disparages him generally, or that his general reputation is thereby affected, it must be such as, if true, would disqualify him or render him less fit properly to fulfill the duties incident to the special character assumed."   *Townsend on Slander and Libel*, sec. 190.   See 18 *Am. & Eng. Ency. of Law* (2 ed.) p. 945, where many authorities are collected.

The specific charge in the article is that the appellant announced to the justice that he would refuse to recommend the payment of the expenses of the inquest, and thereby " stifled " the investigation.   It is imposssible for us to find any theory upon which it can be held that in making such announcement, the appellant was acting within the scope of his official duties as a State's Attorney.   The duties of the State's Attorney are such only, as are prescribed by our Constitution and the statutes of the State.   He possesses no " power by the common law of England for they are unknown to it; nor by the common law of this State, for both they and the power claimed for them are unknown to it."   *Hawkins* v. *The State*, 81 Md. 313.   His duty as prescribed by statute, is to prosecute and defend on the part of the State, in all cases in which the State may be interested: Code, Art. 10, sec. 17.   There is no case before the officer holding an inquest in which there is prosecution to be done on the part of the State; and even if there was, the duty (if it be conceded there was such), to prosecute would not carry with it the obligation on the part of the State's Attorney, to make recommendations as to the payment of the expenses.   It should be borne in mind in this connection that

the charge is not that the appellant committed some wrong while prosecuting or defending for the State before the justice, or omitted to do something he ought as a faithful officer to have done; but only that he "announced" he would not recommend, (to some one, whose name is not given), the payment, &c. This certainly was not within his duties as State's Attorney, and any criticism directed towards him for making such an announcement, affects him only as a private person. As such he had power to make recommendations, but he had no such authority or obligation as a State's Attorney, who has nothing to do, officially, with the expenses of a coroner holding an inquest. If we are correct in this, it would follow, if there were no other reason therefor, that the demurrer to this count was properly sustained.

It is attempted, in the first count, to impute to the words of part of the article, a libelous signification, by means of an innuendo. The alleged libel is set out in this count in the following words; viz. "Probing the mystery. Death of a child at Emory Grove excites suspicion. Infanticide openly charged. Action of the State's Attorney strongly criticised. Citizens are aroused. Many of the most prominent residents of Gaithersburg, Maryland, and nearly the entire population of Emory Grove, a hamlet about a mile from that town are greatly agitated on account of the alleged stifling by the State's Attorney Kilgour (meaning the plaintiff), of an investigation of the mysterious death May 1st, or the night previous of a two-months-old child at Emory Grove. The investigation was started by Justice of the Peace Baughman, and Deputy Sheriff Horton Thompson, and promised, so those officials told a 'Star' reporter to clear up all doubts in the case. The State's Attorney (meaning the plaintiff), appeared at the preliminary hearing before Justice Baughman, however, and announced that he would not recommend the payment of any expenses incurred in making an inquest and that the proceedings were a little later brought to a close. (Meaning thereby that the plaintiff wantonly, wilfully, corruptly, and by malfeasance in the discharge of his official duties as State's Attorney,

aforesaid, stifled and prevented all proper inquiry as to the cause of the death of a two-months-old child at Emory Grove, aforesaid, and thereby perverted the ends of justice)."

There is no *colloquium* to support the innuendo ; and in such case the rule is, that the innuendo "can never be taken to expand or enlarge the meaning of the words used, and give to them a particular meaning different from that in which they would be ordinarily understood in their more innocent signification." *Peterson* v. *Sentman*, 37 Md. 153; *Barnes* v. *State*, 88 Md. 351.

As has been shown there is nothing in the publication that imputes corrupt motives to the appellant, or that he prevented any inquiry into the death of the child, or that he did anything "by malfeasance in the discharge of his official duties." What it is stated he did, was, merely, that he made an announcement. If the inquest was thereby ended, it was by the act of the Justice of the Peace, for which the State's Attorney was not responsible, either personally or as State's Attorney. It seems to us very clear, therefore that when it is claimed that the words of the publication mean or may be taken to mean that the appellant, as a public officer, acted "wantonly, wilfully, corruptly and by malfeasance and thereby *prevented*" the inquiry and "perverted the ends of justice," there is an enlargement of the meaning of the words actually used, far beyond what they will bear. For this reason the count is bad.

We refrain from discussing the sufficiency of the third count, after all that has been already said. We are of the opinion that the innuendo therein set forth, is not warranted by the words of the publication. There is nothing in the publication that by any reasonable interpretation, unaided by *colloquium* or inducement, can be taken to mean that the State's Attorney "had all sufficient evidence" to have required the State's Attorney "to have caused a full investigation of a heinous crime" or that he declined to do so because the baby and Mason were negroes. The count was therefore bad.

Finding no error in the ruling of the Court, the judgment will be affirmed.                    *Judgment affirmed.*

(Decided November 21st, 1902.)