## FENNELL *v.* G.A.C. FINANCE CORPORATION OF BALTIMORE NO. 3 t/a G.A.C. FINANCE CORPORATION

[No. 138, September Term, 1965.]

210.

212

*Decided April 7, 1966.*

*Motion for rehearing filed May 5, 1966, denied May 26, 1966.*

The cause was argued on 2/4/66 before HAMMOND, HORNEY, MARBURY, BARNES and McWILLIAMS, JJ., and reargued on 3/9/66 before HAMMOND, HORNEY, MARBURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ. and CARTER, J., Associate Judge of the Eighth Judicial Circuit, specially assigned.

Argued by *Samuel D. Hill,* with whom were *Buckmaster, White, Mindel & Clarke* and *Michael M. Maslan* on the brief; reargued by *Everett L. Buckmaster* and *Samuel D. Hill* for appellant.

Argued and reargued by *George Psoras* and *Hyman Ginsberg,* with whom were *Ginsberg & Ginsberg* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

In this libel suit the verdict of the jury was in favor of the appellant (Fennell) against the appellee (GAC). The damages came to $40,000, $35,000 of which was styled "punitive," the balance "compensatory." Four months later (5 March 1965) the trial judge granted GAC's motion for a judgment N.O.V. Fennell appealed. While there are a number of subsidiary mat-

ters to be considered we shall be concerned principally with Judge Byrnes' reason for granting GAC's motion.[1] He said that "although * * * [the libelous matter] could well be morally and ethically reprehensible it is not, in this court's opinion, actionable *per se.*"

Fennell was discharged (honorably) from the Air Force in 1952. He was 22 years old at the time. He drifted from one job to another until December of 1960 when he was employed as a salesman by The Jerome Apple Company and The Apple and Bond Company of Baltimore. The former is the general agent of the life insurance department of The Travelers Insurance Companies; the latter are general agents for Travelers' Casualty, Indemnity, Fire and Marine departments.

Although his education was limited and he seems to have had no special skills, he was not without some experience in the insurance business. He was given a drawing account of $125 per week. Although the first few months were disappointing, the sales manager felt (in April) he "would make a good career agent." Having a wife and five children to support, Fennell considered this to be the "best job of his career."

Early in April 1961 the sales manager told Fennell that he had been "taken off of the draw" which meant that he would no longer receive an advance of $125 per week. He explained to Fennell that he had not sold enough insurance to justify continuing the advance. Fennell testified he "wasn't fully aware that * * * [he had been] hired strictly to sell life insurance and casualty on the side * * *." He expressed doubt that he could get along "without some money coming in" so it was agreed that he would receive in cash commissions on any new business he produced. Otherwise his commissions would be retained and applied against the "draw" he had already received. In the next two weeks he "went out and sold close to $200,000 worth of life insurance." He said he "really concentrated on the life, instead of the casualty."

In June 1960 Fennell had borrowed from GAC $1,160 which he agreed to repay at the rate of $58.00 per month. He had borrowed money (which seems to have been repaid) from GAC

---

1. Defendant's motion for a directed verdict was "Reserved" by the court under the provision of Maryland Rule 552 c.

on a number of previous occasions. He was behind in his payments when he went to work for Travelers, a circumstance he had disclosed to his new employer. Fennell said "they knew my complete history, when I went to work there." Early in 1961 GAC allowed him to pay interest to date together with some sort of a penalty, and as a result his note became "current" instead of "overdue."

He was again unable to make the full monthly payments. Late in March the manager (James C. Chambers) telephoned Fennell and asked him if he "was going to come in and make a payment that day." (He had paid $10.00 on 10 March and $15.00 on 23 March.) Fennell replied he "couldn't possibly come in and make a payment that day, because * * * [he] only had a few dollars." Chambers said "he was going to get that payment one way or the other" and that he was going to send a man around "to speak to * * * [his] boss." Fennell said, "If you do that, it's going to cost me my job." According to Fennell, Chambers replied that "he never cared if I worked again" and that "as far as he could see, *I would never get a job anywhere.*" (Emphasis supplied.) About fifteen minutes later a man from GAC (not Chambers) did come to the office. He asked for Mr. Brown, the president, but Fennell fobbed him off on the sales manager (Mr. Hooper) because Hooper was aware of his problems and he was afraid that if the GAC man got in to Mr. Brown "the job would be gone." Whatever Hooper said or did was effective. There is no evidence that Brown ever learned of the visit.

Despite the fact that he was now without regular income Fennell continued his struggle to sell enough insurance to support his wife and family. He was not spectacularly successful but it appears he was making some progress. He sold a number of policies which the company, for one reason or another, had to decline but, as Mr. Brown put it, "I would say it's [Fennell's] an average record for a man who is new in the insurance business; you're going to have policies taken with the zeal of trying to write business that a more experienced man would not take; and I would say it's an average."

On 18 May Chambers dictated and caused to be mailed to

Travelers, with copies to Mr. Brown and Fennell, the following letter:

"'Traveler's Insurance Company
Harford [sic]
Connecticut

RE: FENNELL, Robert C. [T.]

Apple and Bond Incorporated

1 E. Redwood Street

Baltimore 1, Maryland

"Gentlemen:

"It has been brought to our attention that a letter directed to you might bring about a satisfactory settlement of the long overdue indebtedness of the above. Mr. Fennell signed a Promisory [sic] Note with our company on June 1, 1960 in the amount of $1160.00. This loan was contracted to be repaid over a period of twenty months at $58.00 a month.

"There remains as of this date an unpaid balance of $1082.10 with no payments having been received since March 23, 1961.

"All our attempts to have Mr. Fennell pay this moral and legal obligation have been in vain.

"We realize that the Traveler's Insurance Company cannot act as a collection agency, however, we feel quite sure they do not condone this type of behavior; in as much as this man is directly or indirectly handling your funds and is acting as a representative of your company.

"It is our contention that when a man is having financial difficulties, the greater the pressure is exerted the more likely the tendency is to infringe and tip the till.

"We feel quite certain that if your office would discuss this matter with Mr. Fennell and his immediate supervisor, Mr. Herbert C. Brown, and direct the subject to contact us, we could enter into a mutually satisfac-

tory arrangement for the liquidation of this account. "Thank you for your cooperation in this matter.

Very truly yours,
/s/
James C. Chambers
Manager"

The letter was seen by one or more officers of Travelers in Hartford, Mr. Brown, Mr. Apple, Mr. Hooper and probably Mr. Dawson, an executive of the Apple companies. It also became a part of the company's file. Fennell telephoned Chambers immediately after receiving his copy of the letter and asked him why he had done it. Chambers replied, according to Fennell (and it is not denied), "he was going to take care of me; they were going to make sure I got well taken care of, right along * * *."

Chambers was "severely reprimanded" by the regional supervisor of GAC and he was told "if it occurred in the future he would no longer be in * * * [GAC's] employ." [2] At the time of trial he was employed elsewhere (in Connecticut). He did not testify nor does it appear that he was deposed.

Fennell described his relationship with Mr. Brown as "very good" before the receipt of the letter. Afterwards, he said, Brown "became very cold toward * * * [him]. In other words he really wasn't—didn't show an interest at all." Hooper also told him that "Brown's attitude had changed." The following excerpt from Brown's testimony seems to reflect a change in attitude.

> "By Mr. Hill:
> "Q. You don't contend, do you, Mr. Brown, that this letter wouldn't have any effect on being in your file on hiring this man? A. Of course, it would have an effect.
> "(Mr. Hill) Thank you very much.
> "By Mr. Psoras:
> "Q. What effect? A. If we were going to rehire

---

**2.** Chambers left the employ of GAC on 9 March 1962 by "mutual agreement as a result of insubordination."

him, we would want to be sure, first, that he has re-
paid or made arrangements to repay his account, on
the condition that I rehire him, which would be that
he would repay the balance, which goes to Travelers
Insurance Company, and also that he would be on a
commission basis only, rather than on a drawing ac-
count."

It is conceded that Fennell was not actually discharged. He
claims, however, that commissions on new business, which he
was entitled to receive under the arrangement made with him
after he was taken "off of the draw," were not paid to him
but were applied to his indebtedness to Travelers. As a result,
he "was more or less forced out * * *. Without the commis-
sions, * * * [he] had no money to operate with." As Mr.
Brown phrased it, "as is usual in these cases, people have to
eat, men take care of their families. He just left, about May
of 1961." He also testified that Travelers had advanced to Fen-
nell a total of $2,000; that Fennell's commissions (at the time
of trial) amounted to $829.96; that he still owed $1,170.04.

Even after the receipt of the letter Fennell said he continued
to spend some time at the office servicing accounts. For a while
he had a job as a bartender but he was let go to make a place
for a relative of the owner. He received unemployment com-
pensation during the latter part of the summer and in Sep-
tember he enlisted in the U. S. Army.

## I.

At the conclusion of the plaintiff's case, and again at the con-
clusion of the whole case, GAC did not move for a directed
verdict and state its reasons therefor, as provided by Mary-
land Rule 552 a, but instead, on each occasion, prayed the court
to instruct the jury that there was "no legally sufficient evi-
dence to entitle the plaintiff to recover." The trial judge re-
fused the first prayer and reserved his decision in respect of
the second. Whether the proffer and rejection of such a prayer
(often called a "demurrer prayer") can sustain a motion for
a judgment N.O.V. as provided by Maryland Rule 563 a 1
is a question which has not been raised in the case at bar and
it does not, therefore, require our decision. We observe in

passing, however, that the Rules, as they now exist, prescribe the use of the motion for a directed verdict and make no mention of a "demurrer prayer." [3]

Judge Byrnes, in his charge to the jury, declared that the letter was libelous per se, that the plaintiff was "entitled to a verdict" and that their verdict should be for the plaintiff. As stated earlier, he later changed his mind and directed the entry of the judgment N.O.V. We think he was right the first time.

We shall not have to venture very far into the thickets of the law of libel to find support for our decision. Anyone interested in learning just how tangled and how nearly impassable the underbrush really is, need only observe the controversy [4] now raging between Dean Prosser [5] and Mr. Eldredge. [6] In *Kilgour v. Evening Star Co.,* 96 Md. 16, 23-24, 53 Atl. 716 (1902), which in our judgment is controlling here, Judge Page, for the Court, said:

> "The declaration charges that at the time of the publication the appellant was and still is a practicing attorney and the State's Attorney of Montgomery County, and that the publication was 'of and concerning him in respect of his said profession as a prac-

---

3. But see the earlier cases of *Beck v. Baltimore Transit Co.,* 190 Md. 506, 58 A. 2d 909 (1948); *Rinehart v. Risling,* 180 Md. 668, 26 A. 2d 411 (1942); *Clautice v. Murphy,* 180 Md. 558, 26 A. 2d 406 (1942).

4. Eldredge, *The Spurious Rule of Libel Per Quod,* 79 Harv. L. Rev. 733 (1966). See Restatement (Second), *Torts,* Explanatory Note, § 569, at 83-93 (Tent. Draft No. 11, 1965); Prosser, *Torts,* § 107 (3rd ed. 1964); Prosser, *Libel Per Quod,* 46 Virg. L. Rev. 839 (1960).

5. William L. Prosser; Prof. of Law, Hastings College of Law; Dean of Law, University of California 1948-61; Reporter on Torts for the American Law Institute; A.B. Harvard, 1918; LL.B. University of Minnesota, 1928; LL.D. Willamette University, 1950; LL.D. Temple University, 1959; LL.D. University of Cologne, 1959.

6. Laurence H. Eldredge, Member of the Pennsylvania Bar, former Chairman of the Board of Governors, Philadelphia Bar Ass'n; Adviser and former Revising Reporter on Torts for the American Law Institute; B.A. Lafayette College, 1924; LL.B. University of Pennsylvania, 1927.

ticing attorney and of his duties as State's Attorney.' It is not contended that the words of the publication are libelous as against the appellant, otherwise than as they touch upon or have reference to his profession and his official position of State's Attorney. The rule of law applicable to a case of that kind, seems to be clear. 'Words spoken of a person in his office, *trade, profession, business or means of getting a livelihood,* which tend to expose him to the hazard of losing his office, or which charge him with fraud, indirect dealings or incapacity and thereby tend to injure him in his *trade, profession or business,* are actionable without proof of special damage, even though such words if spoken or written of an ordinary person, might not be actionable *per se.'* 18 *Am. & Eng. Ency. of Law,* p. 942 (2nd ed.) ; *Wilson v. Cottman,* 65 Md. 197.

" 'The words must go so far as to *impute to him some incapacity or lack of due qualification to fill the position,* or some positive past misconduct which will injuriously affect him in it.' *Sillars v. Collier,* 151 Mass. 50; *Newell on Defamation, Slander and Libel,* ch. 8, p. 178; *Townsend, Libel and Slander,* secs. 188, 189.

"So this Court said in *Newbold & Sons v. The J. M. Bradstreet & Son,* 57 Md. 53: 'To say or publish of a merchant anything that imputes insolvency, inability to pay his debts, the want of integrity in his business, or personal incapacity or pecuniary inability to conduct it with success, is slanderous or libelous *per se if without justification.'* " (Emphasis supplied.)

In *Pollitt v. Brush-Moore, Etc., Inc.,* 214 Md. 570, 136 A. 2d 573 (1957), Judge Collins, in an opinion adopted by the Court after his retirement, cited *Kilgour* with approval and quoted some of the language set forth above. He cited also *Foley v. Hoffman,* 188 Md. 273, 52 A. 2d 476 (1947) and his comment in respect of that case is especially interesting and relevant:

"[T]he defendant, Foley, the county treasurer, published remarks about the plaintiff, Hoffman, who had

been defendant's chief clerk, which this Court held imputed to the plaintiff, not a particular act of carelessness or carelessness in some particular minor respect, but general incapacity or lack of due qualification to fill the position of chief clerk, and that he was justified in removing him from his staff on the grounds of inefficiency and neglect. It was there held that the demurrer was properly overruled because the words were libelous *per se.*"

\* \* \*

"Plaintiff also claims that the printed newspaper article tended to degrade and expose him to contempt and ridicule. With this contention we agree. In *Goldsborough v. Orem & Johnson,* 103 Md. 671, 64 A. 36, the declaration alleged that the defendant falsely published of the plaintiff and of the majority of the members of the vestry of the church that they did ' "relentlessly turn their back upon legal and moral obligation to the detriment of a rector (meaning the said Reverend Thomas Carter Page) who suffered himself to become debilitated while plodding along the path of duty to his congregation (meaning the congregation of the said Christ Protestant Episcopal Church of Cambridge)," and the defendants meant thereby that the said four members of said vestry, including the plaintiff, voting for the said resolution as aforesaid, and in particular the plaintiff, had relentlessly violated legal and moral obligations.' On demurrer *it was held that this publication was libelous per se and such words charged the plaintiff with conduct calculated to make him the object of scorn and contempt of all honorable men.* For the same reasons that the article here before us charged the plaintiff with conduct incompatible with the proper conduct of his office, it also charged him with conduct tending to degrade and expose him to contempt and ridicule." 214 Md. at 579-80. (Emphasis supplied.)

Judge (now Chief Judge) Prescott, in *Thompson v. Upton,* 218 Md. 433, 437, 146 A. 2d 880 (1958), observed:

"We have so recently had occasion to pass upon the legal principles involved herein, *Pollitt v. Brush-Moore, Etc., Inc.,* 214 Md. 570, 136 A. 2d 573, that it will be unnecessary to unduly elaborate upon them. * * * We shall not attempt to do what has baffled the Courts for these many years, namely, to compose an all-inclusive definition thereof. However, libel includes any unprivileged (i.e. a publication not having an absolute privilege), false and malicious publication which by printing, writing, signs or pictures tends to expose a person to public scorn, hatred, contempt or ridicule, *Foley v. Hoffman,* 188 Md. 273, 284, 52 A. 2d 476; and also embraced therein is any such publication that relates to a person's office, *trade, business* or *employment,* if the publication imputes to him *some incapacity or lack of due qualifications* to fill the position, or some positive past misconduct which will injuriously affect him in it. *Foley v. Hoffman, supra; Pollitt v. Brush-Moore, Etc., Inc., supra,* at p. 577." (Emphasis supplied.)

In the recent case of *Heath v. Hughes,* 233 Md. 458, 197 A. 2d 104 (1964), *Kilgour, Pollitt, Foley* and *Thompson* were cited with approval by Judge Marbury, who spoke for the Court.

GAC argued, perhaps not confidently, that the letter is not actionable per se since the plaintiff was not accused of *having committed* a crime. In *Lewis v. Daily News Co.,* 81 Md. 466, 32 Atl. 246 (1895) it was said of the plaintiff that "he *would be* an anarchist if he thought it would pay." (Emphasis supplied.) Judge McSherry (later Chief Judge) in a caustic opinion said, for the Court:

"[T]o publish of another that he 'would be an anarchist if he thought it would pay,' is to impute to him the possession of that degree of moral obliquity and turpitude which would mark him as a fit per-

son, if he were personally benefited thereby, to do the violent and felonious acts of which anarchists are known or believed to be guilty." *Id* at 474.

In *Lewis* the defendant sought to mitigate the sting of the publication by suggesting that the plaintiff was charged merely with being a political propagandist who advocated visionary schemes. Judge McSherry said it was "grossly libelous" and he paraphrased his characterization in incandescent language. See also *Keating v. Conviser*, 246 N. Y. 632, 159 N. E. 680 (1927).

GAC contends Chambers was merely asking Travelers for cooperation in working out "a mutually satisfactory arrangement for the liquidation of" Fennell's indebtedness, that he was interested only in collecting the overdue payments, that no harm was intended and no harm was done. Our credulity has limits which do not extend that far. Viewed as a whole we think Chambers' conduct reeks with malice and recklessness. What he said to Fennell in the March telephone conversation can hardly be interpreted in any other way. After demanding an immediate payment and being told it was impossible, he threatened to send a man to "speak to the boss." If his threat was intended to be *in terrorem* it was certainly effective. Fennell feared for his job and said so. One would think that GAC's interests would best be served by keeping Fennell employed. But that Chambers was utterly unmindful of his employer's interests seems obvious in the light of his reply. He made it clear that he didn't care whether Fennell ever worked again and that he would see to it that Fennell would never get a job anywhere.

The letter of 18 May unmistakably concerns Fennell. His full name (last name in capitals) appears at the top of the page along with his business address. He is mentioned, in the body of the letter, three times by name and once by reference ("this man"). The letter opens with a statement which is probably untrue. We doubt that anyone ever "brought to * * * [GAC's] attention that a letter directed to" Travelers would effect a collection. The first and second paragraphs succinctly recite the details of Fennell's debt. The next statement ("all our attempts to have Mr. Fennell pay this moral and legal obligation have been in vain") is not entirely true. Fennell made two pay-

ments (small, to be sure) in March. The words "moral and legal obligation" used in conjunction with the phrase "condone this type of behavior" have sinister overtones and suggest that Fennell has been guilty of something dishonest, disreputable or disgraceful which calls for condonation (forgiveness) but which Travelers should not condone. Immediately juxtaposed is the insinuation that because he handles company funds a risk of loss is involved.

The next paragraph leaves little to one's imagination. Chambers, in effect, is saying that when pressure is applied to a man having financial difficulties embezzlement must be expected. There can be no doubt he was referring to Fennell because, as has been said, Fennell was named four times and referred to once; he *was* having financial difficulties and Chambers *was* putting pressure on him.

While Fennell, in normal circumstances, may have been unable to make a go of it, his giving up the job was very likely accelerated by the letter. It is true that he was not discharged but Brown's change of attitude and the withholding of commissions contrary to the agreement suggest that he had become persona non grata.

To suggest to the administrative officers of a man's employer that because he is under pressure from a creditor to pay a debt, he lacks the will power and strength of character necessary to resist embezzling funds coming into his possession in the normal routine of his duties is to impute to him an incapacity or lack of due qualification to fill his position. Such a suggestion tends to injure him if he is in the business of selling insurance as an agent for another, and the words written and published are libelous per se. Whatever doubt remains as to Chambers' frame of mind, at least in our judgment, is whisked away by his statement to Fennell in the telephone conversation following the receipt of the letter. In effect he said, I told you I was going to take care of you and we (GAC) are going to make sure you get well taken care of. Chambers strove for effective distribution of the publication by mailing the letter to Travelers (to the attention of no one in particular) and by sending copies to Brown and Fennell.

In support of its argument that the words published were

not libelous per se GAC cites decisions of this Court and of many other courts. Since we have taken the position that the case before us is controlled by our own decisions, we shall not undertake a discussion of those of other courts. The three decisions of this Court in which GAC places reliance are not, in our opinion, sufficiently germane to the one at bar to be persuasive. In *Stannard v. Wilcox & Gibbs,* 118 Md. 151, 84 Atl. 335 (1912), the letter written to the employer recited the debt incurred by employee's wife in connection with the purchase of a sewing machine, and stated that unless the employee satisfied the "just obligation" (there was some indication that the machine was faulty) suit would be filed. Our predecessors upheld the trial court's ruling that the plaintiff's declaration was demurrable. The letter (in *Stannard*), which appellant insisted was libelous per se, was, compared to the letter in the instant case, thoroughly innocuous and only mildly deprecatory. Judge Stockbridge, for the Court, after a review of the authorities, stated the reason for the Court's decision:

> "In this case Mr. Stannard was not in business on his own account, he was the local manager for a nonresident corporation. It is not alleged or suggested that he had any occasion for the use of credit, or that his credit had been in any way impaired or affected. The statements in regard to him in no way related to the manner of his performance of his duties as manager of the Holmes Electric Protective Company, or charged him with being unfit for the proper performance of them, nor did he lose his position because of the letter in question, in which case he would have sustained special damage. Under these conditions, and applying the rule of law already stated, the letter can not be regarded as actionable *per se,* and the trial Court committed no error in sustaining the demurrer." *Id* at 158, 159.

The defendant in *Simon v. Robinson,* 221 Md. 200, 154 A. 2d 911 (1959) said of the plaintiff that he "fraudulently diverted and converted to his own use" funds deposited with the plaintiff by the defendant. We held that the demurrer was prop-

erly overruled by the court below. The words were clearly libelous per se (among other things they charge the commission of a crime) and were not, as claimed, privileged. Our rule in *Simon* has no application here. Nor, indeed, does *Flaks v. Clark,* 143 Md. 377, 122 Atl. 383 (1923) in which we said:

> "Now when the words in the headline in the article complained of are read in connection with the rest of the publication they can only mean that the plaintiff refused to pay one of his employees, or actors, all that the actor claimed was due him, and that the actor thereupon cut the curtains of the plaintiff's theatre, for which the plaintiff had him arrested. This construction clearly does not impute to the plaintiff a refusal or failure to pay his *honest debts,* or dishonesty or insolvency, or any mismanagement of his theatre calculated to injure or prejudice him or his business. We must therefore hold that the alleged libellous matter does not warrant any of the meanings ascribed to it in the *innuendoes,* and that the demurrer to the declaration was properly sustained by the court below."
> *Id* at 382-83.

## II.

The second count in Fennell's declaration charged GAC with an invasion of Fennell's right to privacy in his employment and in his private affairs. Judge Byrnes, in his charge, told the jury damages might be awarded to Fennell if they found that his privacy had been invaded. Although mentioned in both briefs the question was not argued. However, since neither side excepted (in the court below) to the instruction, there is no occasion for us to give the matter any further consideration.

## III.

The contentions of GAC as cross appellant are many. While most of them are without merit, they, nevertheless, require our consideration. Numbers 6, 7, 8, 9 and 10 relate to the matter of damages. GAC argues (6) that Judge Byrnes should not have instructed the jury to find such compensatory damages as they find proper and (7) that he should have instructed the jury that Fennell had failed to prove any special damages. GAC

failed to note an exception in either instance. In any event, since the publication is libelous per se proof of special damages is not required, *Heath v. Hughes, supra; Thompson v. Upton, supra; Pollitt v. Brush-Moore, Etc., Inc., supra; Kilgour v. Evening Star Co., supra,* and there is ample authority to support the award of compensatory damages. *Evening News Co. v. Bowie,* 154 Md. 604, 141 Atl. 416 (1928) ; *Gambrill v. Schooley,* 93 Md. 48, 48 Atl. 730 (1901) ; *Nolan v. Traber,* 49 Md. 460 (1878) ; Prosser, *Torts,* § 107 (3rd ed. 1964). GAC argues further that the trial judge should have instructed the jury to find no punitive damages (8), that he should not have instructed the jury to find such punitive damages as they found proper (9) or such punitive damages as the plaintiff proved (10). Again GAC did not except to the court's charge, or failure to charge, on the subject of punitive damages. Nevertheless, it is well established that the jury may award punitive damages when the publication is libelous per se. *American Stores Co. v. Byrd,* 229 Md. 5, 181 A. 2d 333 (1962) ; *Simon v. Robinson,* 221 Md. 200, 154 A. 2d 911 (1959).

## IV.

In its 15th contention GAC argues that Chambers had no authority to mail the letter and that the scope of his authority in this regard was for the jury to decide. Although it appears that an instruction to this effect was requested there was no exception to the court's failure to so charge the jury. The closing argument of counsel for GAC was made a part of the record. That GAC is something less than serious in advancing this contention seems to be supported by the following quotation therefrom:

"Listen, I love him; Mr. Fennell is a great guy, has a wonderful personality. He's married, has children. I'm married. He's married and has children. I love him, too. We're all friends; but, because we're friends, and because we're human doesn't mean that G.A.C. isn't, because it's a corporation. Corporations have hearts. They're composed of people. People make up corporations.

"And, unfortunately, James Chambers was one of

those people. I won't comment on his intelligence, or lack of it, rather, but I would say that the letter should never have been written."

## V.

During the trial, counsel for Fennell sought to show that GAC, in an answer to a request for an admission of fact, had made a statement at variance with the trial testimony of one of its witnesses. An objection was made by counsel for GAC but the court did not rule on the objection. GAC contends (14) that the court erred in not sustaining the objection and in failing to instruct the jury to disregard the evidence. There was no subsequent motion to strike nor was there any request for an appropriate instruction to the jury. Even if the question were properly before us, and even if the trial judge did err, it would be an almost perfect example of harmless error.

## VI.

In contentions 11, 12 and 13 GAC claims the trial judge should not have allowed evidence of the wealth of GAC's parent corporation, that he should not have allowed evidence of the wealth of GAC and that he should not have instructed the jury that they could consider the means and wealth of GAC because "an amount that might be extremely punitive and severe to a defendant of small or moderate means could be light and trivial to a defendant of much larger means." There is no merit in contention number 11. Whatever harm there may have been in the brief reference to the means of General Acceptance Corporation, of which GAC is a wholly owned subsidiary, was erased by what Judge Byrnes told the jury:

"(The Court) You are only to consider the assets of the G.A.C. No. 3. That's the Baltimore branch; is it?

"(Mr. Psoras) Yes, Your Honor.

"(The Court) The other G.A.C. Companies or the parent company would have no responsibility in this case. That's a matter of law."

GAC's balance sheet, as of 25 of July 1963, showed assets in excess of $400,000 and there is no apparent basis for a conten-

tion that the jury, in arriving at the amount of the damages, considered anything else.

Contentions 12 and 13 can be disposed of quickly. Whenever punitive damages are allowable, evidence of the defendant's means is admissible. *Schloss v. Silverman,* 172 Md. 632, 192 Atl. 343 (1937); *Cairnes v. Pelton,* 103 Md. 40, 63 Atl. 105 (1906). Whether Judge Byrnes' comment on the punitive effect of the amount of damages in the case of an impecunious defendant vis-a-vis a wealthy defendant is, in the circumstances, prejudicial, is a question we need not decide because no exception to it was noted. Maryland Rule 554 e.

### VII.

After the period of limitations had expired Fennell filed an amended declaration. The amendment consisted of three additional counts, one charging invasion of privacy, another charging interference with the contract of employment and a third charging the illegal divulgement of personal affairs. The last two were later abandoned. GAC, in its 16th contention, argues that since the original declaration did not state a cause of action, it could not be revived by amendment after the running of the statute. Since the libel count, which did state a cause of action, was restated *in totidem verbis* and the additional count charging invasion of privacy was merely a change in legal theory based on the same general aggregate of operative facts, the contention must be rejected. *Cline v. Fountain, Etc., Company,* 214 Md. 251, 134 A. 2d 304 (1957). Fennell asserts that the period of limitations in respect of the invasion of privacy count is three years. GAC argues that such an action is barred after one year. Since it is unnecessary for us to do so, we shall not undertake the resolution of these conflicting views.

### VIII.

In its 4th contention GAC argues that its demurrer to the amended declaration should have been sustained. The only reasons put forward are that the letter is not libelous per se, that special damages were not alleged and that the suit is barred by limitations. Since these matters have already been disposed of no further comment is required.

## IX.

Incident to the discovery skirmishes prior to trial GAC filed a motion to dismiss and a motion ne recipiatur. In its 17th contention it argues that the denial of these motions is reversible error. We do not agree. Maryland Rule 417 d leaves this within the discretion of the trial court. Judge Prendergast, who presided at the hearing on the motions, stated fully his reasons for denying the motions and we are satisfied he did not abuse his discretion.

## X.

In its 3rd contention GAC argues that Fennell's motion to dismiss its cross appeal should be denied. Fennell contends GAC cannot appeal from a judgment in its favor. This contention is without merit because a cross appeal must be taken by the party prevailing in the trial court if he wishes to preserve the right to have *adverse* rulings reviewed. See *Reece, Adm'r v. Reece,* 239 Md. 649, 212 A. 2d 468 (1965) and cases collected in 2 M.L.E., *Appeals,* § 353 (1960).

## XI.

As allowed by Maryland Rule 563 a 3, GAC, having moved for a judgment N.O.V., prayed in the alternative for a new trial. Judge Byrnes, as has been said, granted the motion for a judgment N.O.V. but he did not deny (overrule) the prayer (motion) for a new trial. GAC now contends, assuming we reverse, which we do, that the case should be remanded to enable the trial court to rule on the motion for a new trial. Maryland Rule 563 c 1 provides as follows:

> "c. *Appeal—Effect of Reversal.*
> "1. Of Judgment N. O. V.
> "Where a judgment so entered by the trial court is reversed on appeal, the Court of Appeals (1) shall remand the case for a new trial if the lower court conditionally so ordered or (2) otherwise may order a new trial or enter such judgment upon the original verdict as justice may require."

Since we have dealt with all of the matters which might be argued in support of the motion we see no reason for ordering

a new trial nor do we see any reason why it should be sent back for a ruling by Júdge Byrnes, because he would be required, in light of the views expressed in this opinion, to deny the motion.

## XII.

GAC, acting pursuant to Maryland Rule 835 b 5, moved to dismiss the appeal and cited as cause therefor a violation by Fennell of Maryland Rule 828 b relating to the printing of extracts from the record. We shall not undertake a narration of what came to pass in this regard. While we feel bound to express our disapproval of the attitude and course of action adopted by counsel for Fennell, we are unable to discern any lasting prejudice to GAC, although it is clear that its attorney was inconvenienced and some otherwise avoidable expense was incurred. We shall deny the motion but, exercising the discretion referred to in Maryland Rule 882, we shall require Fennell to pay the cost of printing GAC's brief and appendix. See *Operations Research v. Davidson*, 241 Md. 550, 217 A. 2d 375 (1966).

*Motion to dismiss appeal denied.*

*Motion to dismiss cross appeal denied.*

*Judgment N.O.V. reversed.*

*Judgment entered on the verdict of the jury in favor of appellant against appellee in the amount of $40,000 with interest from the date of the verdict.*

*Appellant to pay the cost of printing appellee's brief and appendix.*

*Remainder of costs to be paid by appellee.*