# PHILLIPS L. GOLDSBOROUGH *vs.* OREM & JOHN-
SON.

*Libel—Publication Libellous per se as to Conduct of Vestryman—De-
murrer to Declaration—Innuendo—Question for Jury.*

The declaration in action of libel set forth that the defendant falsely pub-
lished of the plaintiff and certain other members of the vestry of a
church, constituting the majority, that they had "relentlessly turned
their back upon legal and moral obligation to the detriment of a rector
who suffered himself to become debilitated while plodding along
the path of duty;" also that in order to remove opposition to his re-elec-
tion as vestryman the plaintiff had promised not to call a certain rector
unless it was satisfactory to the church, and that plaintiff had violated
his promise.  Upon demurrer held, that by a fair construction of the
words declared on, with the aid of the other averments of the declara-
tion, it appears that these words were intended to apply to the plaintiff
individually.

*Held*, further, that these publications are libellous in law.

To publish of plaintiff and other members of a vestry that they promised
not to call a certain person as rector and because of said promise no
effort was made to change the vestry is not in itself libellous.

When a declaration alleges that a publication which denounces the ac-
tion of a corporate body was intended to apply to the plaintiff and was
so understood by the readers of the publication, it is a question for the
jury whether these allegations are true or not.

Upon demurrer to a declaration in libel it is for the Court to determine
whether the words charged amount in law to libel or not, and also

whether an *innuendo* is fairly warranted by the language declared on when read either alone or in connection with the inducement and colloquium.

The *innuendo* cannot impute to the words declared on a meaning which those words in themselves or taken in connection with the inducement or colloquium does not fairly warrant.

Appeal from the Circuit Court for Dorchester County (HOLLAND and LLOYD, JJ.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Edgar H. Gans* and *Charles Markell, Jr.* (with whom were *F. H. Fletcher* and *W. Laird Henry* on the brief), for the appellant.

*Sewell 1. Milbourne* and *George H. Dawson, Jr.,* (with whom was *Jno. R. Pattison* on the brief), for the appellees.

BURKE, J., delivered the opinion of the Court.

This is an action of trespass on the case for libel. There are four counts in the declaration, and the publications which constitute the alleged libels appeared in a newspaper published in Dorchester County, Maryland, called the *Democrat and News*, of which the defendants were the owners, editors, and publishers. The publications appeared on the second of May, 1903, and on the 6th and 27th of February, 1904.

At the time of the publications complained of, and for a number of years prior thereto, the plaintiff was a member of the vestry of Great Choptank Parish of the Diocese of Easton, in the State of Maryland, of the Protestant Episcopal Church. Christ Protestant Episcopal Church of Cambridge, of which the Reverend Thomas Carter Page had for some years been rector, was situated in said parish, and the business affairs of said church, including the selection and removal of its rector, are and were controlled and directed by the vestry of Great Choptank Parish. In the fall of 1902, the health of Mr. Page, the rector, became so impaired that the vestry granted him a

leave of absence for the period of six months, and during his absence another clergyman, who had been recommended by Mr. Page, was appointed by the vestry to discharge the duties of rector. The leave of absence granted Mr. Page would have expired on or about the 10th of May, 1903. The vestry, inspired by a desire to promote the welfare of the church and parish, and believing that Mr. Page would be physically unable to perform the duties required of him as rector at the expiration of the leave of absence, and knowing that said church and parish were financially unable to support two rectors, determined to request him to tender his resignation. Upon the propriety of this request great and decided opposition developed both in the membership of the vestry and in the congregation, which resulted in a bitter factional feeling. The plaintiff was opposed to the retention of Mr. Page. The vestry was composed of eight members. On the 18th of April, 1903, at a meeting of the vestry, at which seven members were present, by vote of four of its members, including the plaintiff, a resolution was passed requesting Mr. Page to tender his resignation as rector to take effect on the first day of June, 1903, and directing its registrar, Mr. Bayley, to notify him of its action. On the 22nd of April, 1903, at a special meeting of the vestry, the resolution of the 18th of April was rescinded before notification thereof had been sent to Mr. Page. The plaintiff voted for the rescission of the resolution. Before the revocation of said resolution, but without the knowledge thereof of the vestry, Mr. Page had sent his resignation.

The declaration alleges: "That the citizens of said town of Cambridge and in other portions of said county and elsewhere, where the said newspaper circulated and was read, and in particular the readers of said newspaper on the 2nd day of May, 1903, well knew the persons composing said vestry, and those thereof opposed to the retention of the said Reverend Thomas Carter Page as rector aforesaid; and those thereof voting for said resolution as aforesaid; yet the defendants well knowing the premises, and contriving, and wickedly and maliciously

intending to injure the plaintiff in his good name, fame and credit, and to bring him into public scandal, infamy and disgrace, with and amongst all his neighbors and other good and worthy citizens of the county aforesaid, and elsewhere wherever the said newspaper would be circulated and read, heretofore, towit: On the 2nd day of May, 1903, referring to the action of said four members, including the plaintiff, in voting for the passage of said resolution, and their opposition to the retention of the said Reverend Thomas Carter Page as rector as aforesaid, falsely, wickedly and maliciously did compose and publish, and caused to be composed and published in their said newspaper, called the *Democrat and News*, of and concerning the said four members of said vestry, including the plaintiff, so voting for the said resolution as aforesaid, and in particular of and concerning the plaintiff, and of and concerning the said office of the said four members of the said vestry, including the plaintiff, voting for said resolution as aforesaid, and in particular of and concerning the aforesaid office of the plaintiff, and of and concerning the conduct of the said four members of the said vestry, including the plaintiff, voting for the said resolution as aforesaid in their said offices, and in particular of and concerning the plaintiff's conduct in his said office, a certain false, scandalous, malicious and defamatory libel, which was understood by the readers of said newspaper in the sense hereinafter set forth in the *innuendo*, and intended by the defendants to be so understood, containing amongst other things, the false, scandalous, malicious, defamatory, libellous matter, and caused the same to be widely circulated and read in the said town of Cambridge, in other portions of said county and elswhere, as follows, that is to say, "the vestry (thereby meaning the said four members, including the plaintiff, so voting for said resolution as aforesaid, and in particular the plaintiff), "relentlessly turn their back upon legal and moral obligation to the detriment of a rector (meaning the said Reverend Thomas Carter Page) who suffered himself to become debilitated while plodding along the path of duty to his congregation (meaning the congregation of the said Christ Protestant

Episcopal Church of Cambridge)." and the defendants meant thereby that the said four members of said vestry, including the plaintiff, voting for the said resolution as aforesaid, and in particular the plaintiff, had relentlessly violated legal and moral obligations."    This constitutes the first count.

The second count declares upon the said publication set out in the first count, but avers the words were written and published of the plaintiff in his office and character of vestryman in said parish.

The circumstances under which the alleged libel was published upon which the third count is based are as follows: The vestry of Great Choptank Parish aforesaid is elected annually on Easter Monday by the qualified voting members of the parish.    The date for the election of the vestrymen for the parish for the year 1904, was the 13th day of April of that year, and at that meeting the plaintiff was duly elected one of the vestrymen of said parish.    After Mr. Page had resigned, a meeting of the vestry, attended by all its members was held, and by vote of five to three, the plaintiff being one of the five, extended a call to Reverend Arthur E. Waltham to the rectorship of Christ Church, which call he accepted.    For sometime prior to, and up to the annual election of vestrymen for the year 1903, the five vestrymen, including the plaintiff, so voting to extend said call were well known to the voting membership of said parish to favor calling Mr. Arthur E. Waltham as rector of the church to succeed Mr. Page.

We here insert the following averments of the declaration: "That the said five members of the said vestry so voting for the aforesaid call to the said Reverend Arthur E. Waltham on the 6th day of February, 1904, and prior thereto, and subsequent thereto desired to succeed themselves in their office of said vestrymen, and were so known at all of said times to so desire to succeed themselves as aforesaid by said voting members of said parish, many of whom were readers of said newspaper on the said 6th day of February, 1904; yet the defendants well knowing the premises and contriving, and wickedly and maliciously intending to injure the plaintiff in his good name, fame and

credit, and to bring him into public scandal, infamy and dis-
grace, with and amongst all his neighbors, and other good and
worthy citizens of the county aforesaid and elsewhere
wherever the said newspaper should be circulated and read,
and to prevent the plaintiff from being elected a vestryman of
said Great Choptank Parish at the annual election of vestry-
men to be held on the 13th day of April A. D., 1904, falsely,
wickedly and maliciously did compose and publish, and caused
to be composed and published in their said newspaper, called
the *Democrat and News*, of and concerning the said five mem-
bers (including the plaintiff) of the said vestry of the said
Great Choptank Parish so voting for the call to the said Rev-
erend Arthur E. Waltham as rector of said Christ Church as
aforesaid, and in particular of and concerning the plaintiff, and
of and concerning the office of the said five members (includ-
ing the plaintiff) of the said vestry of said Great Choptank
Parish so voting for the call to the said Reverend Arthur E.
Waltham as rector of said Christ Church as aforesaid and in
particular of and concerning the aforesaid office of the plain-
tiff, and of and concerning the conduct of the said five mem-
bers (including the plaintiff) of the said vestry of said Great
Choptank Parish so voting for the call to the said Reverend
Arthur E. Waltham as rector of said Christ Church as afore-
said, in their said office, and in particular of and concerning
the plaintiff's conduct in his said office, a certain false, scan-
dalous, malicious and defamatory libel (which was understood
by the readers of said newspaper in the sense hereinafter set
forth in the *innuendo* and was by the defendants to be so un-
derstood, and caused the same to be widely circulated and
read in said town of Cambridge, and in other portions of said
county and elsewhere, as follows, that is to say:

"Rector of Christ Church Has Resigned."

At the conclusion of his sermon Sunday morning (meaning
a sermon preached in said Christ Church) Reverend Arthur E.
Waltham, rector of Christ Episcopal Church (meaning said
Christ Church) stated that he intended to resign.    In his
statement to the congregation Mr. Waltham is quoted as say-

ing: "Finally I close with what I hope will be a real message of peace to those who, for no adequate cause, have absented themselves from us for the past year. So far as the majority of the congregation is concerned, and which is still worshipping within these walls, it has, so I am informed, never known greater peace and cordiality among members; more marked success, or greater prosperity than at present. Still, those without have ever been in my mind, and in order to show them that the self-sacrifice I have ever preached to others I am ready to follow myself, I have decided (since the absentees urge this point as essential to their return) to offer my resignation to the vestry as soon as I have, with the promised cordial help of the bishop, secured another suitable appointment." Mr. Waltham came to Cambridge over a year ago, being called by the vestry of Christ Church (meaning said Christ Church) in the capacity of rector in charge of the church until a vacation granted to Reverend Thomas Carter Page, who, at that time, was rector of Christ Church (meaning said Christ Church) should have been ended. During the month of February, in the year 1903, opposition among a few to Mr. Waltham became apparent (meaning opposition to him as rector), which grew in volume and strength as the day for election of vestrymen approached (meaning the aforesaid annual election). Upon the promise of the vestrymen (meaning the said five vestrymen so voting to extend the aforesaid call to the said Reverend Arthur E. Waltham as aforesaid) not to call Mr. Waltham (meaning the said Reverend Arthur E. Waltham) unless it was satisfactory to the congregation of the church (meaning said Christ Church), no effort was made to change the vestry (meaning the vestry of said Great Choptank Parish) by the voting membership of the church (meaning said Christ Church). In the face of all the opposition, Mr. Waltham accepted the call made by a majority (meaning the said five members of the said vestry of said Great Choptank Parish, including the plaintiff, so voting to extend the aforesaid call to the said Reverend Arthur E. Waltham as aforesaid) of the vestry (meaning the vestry of said Great Choptank Parish).

Since that hour many of the congregation (meaning the congregation of said Christ Church) have not entered the church (meaning said Christ Church), and bided their time until the day for the election of vestrymen should arrive (meaning the said annual election to take place on the 13th day of April, 1904, as aforesaid). For several weeks both sides (meaning those favorable and those unfavorable to the retention of the said Reverend Arthur E. Waltham as rector) have been devising plans to meet and decide the question (meaning whether the said Reverend Arthur E. Waltham should be retained as said rector or not). One side determined that Mr. Waltham should not be re-elected rector; the other side in a quandary as what they should do. Consequently it may be imagined that Mr. Waltham's announcement was a surprise. After the services were over many of his friends expressed their protest of the rector's action, and were moved to tears when it was announced that his action was final. At a meeting of the vestry on Monday afternoon Mr. Waltham said he had written to the Bishop and asked him to get him another place, which he promised to do; and, as soon as the Bishop had done so, he was ready to hand in his resignation;" and the defendants meant thereby that the said five members (including the plaintiff) of the said vestry of the said Great Choptank Parish so voting for the call to the said Reverend Arthur E. Waltham as rector of said Christ Church as aforesaid, and in particular, the plaintiff, made a promise to the voting membership of said Christ Church in said parish, prior to the annual election of vestrymen of said Great Choptank Parish to be held on Easter Monday, in the year 1903, that if elected as a vestryman, and vestrymen of said Great Choptank Parish at said election, that they, and he (the said five members of said vestry of said parish, including the plaintiff, so voting for the call of the said Reverend Arthur E. Waltham as rector of said Christ Church as aforesaid), and in particular the plaintiff, would not if elected at said election vote to call the said Reverend Arthur E. Waltham as rector to said church unless it was satisfactory to the congregation of said Christ Church; and the defendants

also meant thereby that the said five members, including the plaintiff, of the said vestry of the said Great Choptank Parish so voting for the call to the said Reverend Arthur E. Waltham as rector of said Christ Church as aforesaid, and, in particular, the plaintiff, by said promise prevented opposition to their election and his election (that is the election of the said five members and in particular the election of the plaintiff) as vestrymen and vestryman of said parish at said annual election in the year 1903; and the defendants also meant thereby that the said five members (including the plaintiff) of the said vestry of the said Great Choptank Parish so voting for the call of the said Reverend Arthur E. Waltham as rector of said Christ Church as aforesaid, and, in particular, the plaintiff, had been elected vestrymen and vestryman of said parish at said annual election, and that after the said election of said vestrymen and vestryman as aforesaid, that the said five members (including the plaintiff) of the said vestry of the said Great Choptank Parish so voting for the call of the said Reverend Arthur E. Waltham as rector of said church as aforesaid, and, in particular, the plaintiff, had violated their and his said promise."

The words which this count allege to be libellous are these: "Upon the promise of the vestrymen not to call the said Reverend Arthur E. Waltham, unless it was satisfactory to the congregation of the church, no effort was made to change the vestry by the voting membership of the church. In the face of all the opposition Mr. Waltham accepted the call made by the majority of the vestry."

The fourth count is based upon a publication which appeared in the defendant's paper under date of February 27th, 1904. It merely charged that the vestrymen promised not to call Mr. Waltham as rector unless it was satisfactory to the congregation, and because of the said promise no effort was made to change the vestry. This was clearly not a libellous publication, and, therefore, this count will not be further considered.

The defendants demurred to each count of the declaration, the Court sustained the demurrers, and the plaintiff declining

to plead further judgment was entered for the defendants, and the plaintiff has prosecuted this appeal.

Unjustifiable assaults upon private character are most detestable, and in many instances are treated by the Courts as actionable wrongs, and sometimes are punished as criminal offenses. "Reputation and honor are no less precious to good men than bodily safety and freedom. In some cases they are dearer than life itself. It is needful for the peace and welfare of a civilized commonwealth that the laws should protect the reputation as well as the person of the citizen. In our law some kinds of defamation are the subject of criminal proceedings, as endangering public order or being offensive to public decency or morality. VICE CHANCELLOR MALINS in *Dixon* v. *Holden*, L. R. 7 Eq. 492, declared a man's reputation to be his property, and, if possible, more valuable than any other property. CHIEF JUSTICE BEST in *DeCrespigny* v. *Wellesly*, 5 Bing. 406, said that, if we reflect upon the degree of suffering occasioned by the loss of character, and compare it with the loss of property, the amount of the former injury far exceeds the latter. It was said by FORTESCUE, J., in *Button* v. *Hayward*, 8 Mod. that "it was the rule of HOLT, CHIEF JUSTICE, to make words actionable whenever they *sound to the disreputation of the person* of whom they were spoken, and this was also Hale's and Twisden's rule, and I think a very good rule."

It is therefore the duty of everyone to forbear to speak, or write and publish false defamatory words of another, because he thereby commits a breach of duty which he owes to the other. It was said by CHIEF JUDGE McSHERRY, in *Lewis* v. *The Daily News Company*, 81 Md. 466, that upon demurrer it is always the province of the Court to determine whether the words charged in the declaration amount in law to libel or slander. *Dorsey* v. *Whipps*, 8 Gill, 462; *Haines* v. *Campbell*, 74 Md. 158; *Avirett* v. *The State*, 76 Md. 510.

And it is equally a matter of law as to whether an *innuendo* is good; that is to say whether it is fairly warranted by the language declared on, when that language is read either in

itself, or in connection with the inducement and colloquium set forth.   *Avirett* v. *The State, supra*; *Solomon* v. *Lawson*, 8 Q. B. 828.

But the *innuendo* cannot enlarge, or add to the sense or effect of the words declared on, or properly impute to them a meaning which the publication either in itself, or taken in connection with inducement or colloquium does not fairly warrant."

There is no actual or special damage alleged in either count of the declaration, and the question is, assuming for the moment that the words referred to the plaintiff:   Are the publications declared on in the first, second and third counts of the declaration, when read in connection with inducements, colloquium and *innuendo, per se* libellous?   A false and malicious printed, or written publication which imputes conduct, or qualities tending to disparage, or degrade the plaintiff, or expose him to contempt, ridicule or public hatred, or prejudice his private character, or credit are libellous *per se.    Digby* v. *Thompson*, 4 Barn. & Adol. 821; *Fray* v. *Fray*, 17 C. B. N. S. 603: *Moaks Underhill on Torts*, p. 120; *Richardson* v. *State*, 66 Md. 210; *Negley* v. *Farrow*, 60 Md. 175; *Snyder* v. *Fulton*, 34 Md. 128.

The demurrer admits the publications by the defendants, and also admits that the words are both false and malicious, and when tested by the well-established rules referred to for determining the actionable character of defamatory language, whether written or spoken, we think the publications are grossly libellous. The plaintiff had been selected by his fellow members of the church to which he belonged to discharge the duties of a responsible position.   Their action impled the greatest confidence in his uprightness, integrity, and honor. They committed to him and his associates in the vestry the power to manage and control the temporal affairs of the church, with the power to call and remove its rector.   To publish of one so situated, and charged with the performance of duties of such a nature, that he has relentleslsy turned his back "upon moral and legal obligations to the detriment of a

rector who had suffered himself to become debilitated while plodding along the path of duty to his congregation," or that he had violated a promise he had made to the voting membership of the church, whereby opposition to his election as vestryman was prevented, is to charge him with conduct calculated to make him the object of the scorn and contempt of all honorable men.    Such charges, published under the circumstances detailed in the counts we are considering are clearly libellous in law.

Did the defamatory words stated in the first and second counts refer to the vestry as a corporate body, or were they directed to the individual members of the vestry who were opposed to Mr. Page's retention as rector?    The plaintiff was one of the vestry who was opposed to Mr. Page continuing as pastor of the church, and, if by a fair and reasonable construction of the words declared on, with the aid of the other averments of the declaration, it could be said that those words were intended to apply to him individually there could be no question as to his right to sue.    The general rule is that the publication must be construed in the sense in which hearers or readers of common and reasonable understanding would ascribe to them.    It is stated in *Odgers on Libel and Slander* (Text-Book Series 99) that "if the words spoken, or written though plain in themselves apply equally well to more persons than one, evidence may be given both of the cause and occasion of the publication, and of all the surrounding circumstances affecting the relation between the parties."    The plaintiff may call at the trial his friends, or those acquainted with the circumstances, to state that on reading the libel they at once concluded it was aimed at the plaintiff.    All the facts and circumstances surrounding the publication of the articles in this case lead fairly and naturally to the conclusion that the purpose of the writer of the articles was the denunciation of the persons in the vestry who opposed the return of Mr. Page as rector.    Had it been his purpose to denounce the vestry as a legal entity, is it reasonable to suppose that he would have spoken of it as having relentlessly turned "*their back*

upon moral and legal obligations, &c." In *Caruth* v. *Richeson*, 96 Mo. 186, it is said that: "The law is well settled that if the defamatory matter points to no person in particular, it then becomes a question of fact whether it does, or does not apply to the plaintiff.   Even where a class is described, it may be that the slander refers to a particular individual, and whether it does or does not may be shown by other evidence. 2 *Addison on Torts* (Wood's ed. 378.)   When the language is ambiguous, and is it doubtful in what sense the publisher intended it, the question is in what sense the hearers understood it, for slander and damage consist in the comprehension of the hearers."   The declaration alleges that the words were intended to apply to the plaintiff and that it was so understood by the readers of the defendants' newspaper, but whether these averments be true or not are questions of fact which should be submitted to the jury.

For the reasons given we consider the first, second and third counts of the declaration sufficient in law, and the judgment must, therefore, be reversed.

> *Judgment reversed with costs above and*
> *below, and new trial awarded.*

(Decided June 15th, 1906.)