994 A.2d 1019

Stephen P. NORMAN

v.

Scott C. BORISON, et al.

No. 0054 Sept.Term, 2009.

Court of Special Appeals of Maryland.

May 7, 2010.

408

Cynthia Young, Annapolis, MD, for Appellant.

Stephen Y. Brennan, Pasadena, MD, Laura K. McAfee, Baltimore, MD, Michael J. Sepanik, Washington, DC (Carr Maloney, PC, Robert Brager, Sarah E. Albert, Kathleen H. Meredith, Iliff, Meredith, Wildberger & Brennan, PC, on the briefs), for Appellee.

Panel: WOODWARD, WRIGHT and FREDERICK J. SHARER (Retired, Specially Assigned), JJ.

WRIGHT, Judge.

Appellant, Stephen Norman ("Norman"), filed suit in the Circuit Court for Montgomery County alleging that he was defamed by statements made by appellees[1] in connection with a lawsuit currently pending before the United States District Court for the District of Maryland. Appellees filed motions to dismiss, and after conducting a hearing, the circuit court dismissed all counts of the lawsuit. Norman noted this appeal, presenting the following questions for our consideration:[2]

---

**1.** Appellees are Scott Borison, Phillip Robinson, Janet Legg, the Legg Law Firm, LLC, Civil Justice, Inc., Peter Holland, Benjamin Carney, and the Holland Law Firm, P.C.

**2.** The appellant filed a motion to strike materials from appellees' appendices. The appellees filed a consolidated response in opposition to appellant's motion to strike materials from appellees' appendices and appellees' request to take judicial notice. It was not necessary to

I. Did the trial court erroneously dismiss appellant's claims since appellant was repeatedly personally referred to in the appellees' second amended federal complaint, and the defamation of a small unique company may give rise to personal claims for defamation when the facts alleged are such that a reasonable person could understand that the defamatory comments referred to appellant or when there are allegations that persons familiar with the situation understood the comments referred to appellant?

II. Did the trial court err in finding absolute privilege extends to all pleadings in a suit when the pleadings are published to the press and on the internet, entities and forums not connected to the underlying judicial proceeding?

III. Was the publication of a previously filed, but not yet available to the public, judicial complaint to the press and on the internet by the attorneys who drafted the underlying pleading protected by the fair reporting privilege when there was no judicial action in the case and the attorneys self reported the pleadings they drafted without solicitation from the press in a matter in which they had a substantial financial interest, and where there are allegations the publication was committed with malice?

IV. Did the appellant sufficiently allege falsity when falsity was either specifically alleged in all counts, was alleged by reference to the averments in prior paragraphs, or by including allegations that the defamatory remarks in all counts were made with malice?

We conclude that appellant does not have standing to sue for defamation, and that the absolute privilege extends to the allegedly defamatory statements, thereby answering "no" to

consider appellees' appendices and, therefore, the appellant's motion is rendered moot.

questions I and II. We therefore affirm the judgment of the circuit court and need not address questions III and IV.

## FACTUAL & PROCEDURAL BACKGROUND

### The Parties

Norman was the owner, operator and attorney for Sussex Title, LLC [3] ("Sussex") (formerly known as CAP Title, LLC) from November 2001 to December 18, 2008. Alexander Chaudhry and Ali Farahpour are Norman's former business partners in Sussex. Appellees are attorneys who filed a class action lawsuit against various companies alleging mortgage fraud. Appellees, Scott Borison and Janet Legg, are attorneys with the Legg Law Firm, LLC. Appellee, Phillip Robinson, is the executive director of Civil Justice, Inc., a non-profit legal services organization affiliated with the University of Maryland School of Law. Appellee, Peter Holland, is an attorney with the Holland Law Firm, P.C. Benjamin Carney is an attorney formerly employed at the Holland Law Firm, P.C. Carney was not working for the Holland Law Firm when appellant filed his defamation case against appellees.

### The Class Action Litigation

On June 18, 2007, appellees filed a class action suit on behalf of several hundred homeowners, alleging that the Metropolitan Money Store, along with several other companies and real estate professionals, engaged in mortgage fraud. The action also alleged wire fraud, mail fraud, and Racketeer Influenced and Corrupt Organization Act ("RICO") [4] claims. The suit was originally filed in the Circuit Court for Prince George's County on June 18, 2007. Sussex was named as a Defendant; however, neither Norman nor any other owner or employee of Sussex was named as a defendant nor identified by name in

---

**3.** An LLC, or limited liability company, is defined as "a permitted form of unincorporated business organization which is organized and existing under [the Limited Liability Company Act]." Md.Code (1975, 2007 Repl.Vol.), Corporations & Associations Article § 4A–101(*l* ).

**4.** In 1970, Congress passed RICO, codified at 18 U.S.C. § 1961–1969. The goal was to eliminate the ill-effects of organized crime.

the body of the complaint. On July 24, 2007, appellees voluntarily dismissed the case and filed a new class action in the United States District Court for the District of Maryland, captioned *Proctor, et al. v. Metropolitan Money Store, et al.* The Federal Complaint again named Sussex, and also Chaudhry as a defendant, but Norman was not named as a defendant or identified by name elsewhere in the complaint.

On January 21, 2008, appellees filed a first amended complaint, adding Farahpour and Wilbur Ballesteros as defendants and dropping Sussex, which had recently filed for bankruptcy protection.[5] Ballesteros was a Sussex employee who acted as the settlement agent and notary public in the class transactions facilitated by Sussex. Norman was not named as a defendant or identified by name in the first amended complaint; however, the complaint contained allegations that "anyone at Sussex" could have discovered the scheme, including "the respective principals" and the "owners and employees" of Sussex. The first amended complaint was ultimately dismissed with leave to re-file in light of the new pleading standards in federal court established by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). *Proctor v. Metro. Money Store Corp.*, 579 F.Supp.2d 724, 730–31, 745 (D.Md.2008).

On November 14, 2008, appellees filed a second amended complaint. It named Chaudhry and Farahpour as defendants, but did not name Ballesteros, Sussex, or Norman as defendants. However, for the first time, Norman was mentioned by name as an owner of Sussex. The references to Norman in the second complaint are as follows:

18. . . . The payments to Ballesteros were items paid out of the share of monthly proceeds to Farahpour, Chaudhry and Norman.

29. Sussex is an entity owned and controlled by Farahpour, Chaudhry, and a third person, Steven Norman

---

5. *See Proctor v. Metro. Money Store Corp.*, 579 F.Supp.2d 724, 727 n. 6 (D.Md.2008).

[sic]. It had offices in the same location as Money Tree Funding. Sussex changed its name from CapTitle and filed for bankruptcy in the U.S. Bankruptcy Court of Maryland in late 2007. Based on testimony of Norman in connection with the bankruptcy case, Sussex was operated for the financial benefit of the three owners since Ali Farahpour would review the company's records and make an equal monthly distribution to each of the three based on the money received by the company during the given month after payment of expenses and leave some amount of reserve for future expenses.

61. Wilbur Ballesteros was paid a salary out of Chaudhry, Farahpour and Norman's share of revenues generated by the operation of Sussex as well as a bonus per settlement in which he was involved.

102. The HUD–1s for the Proctor Family's January 24, 2006 transaction shows that the remaining equity of more than $164,372.59 was all going to the Proctors, but Jackson, McCall and Mr. Fordham, Metropolitan and F & F and their affiliates actually illegally took more than $100,000 of the Proctor Family's money, as shown by a disbursement sheet. Jackson, McCall, Mr. Fordham, Metropolitan and F & F were only able to obtain these funds through the complicity and cooperation of Sussex. The loans obtained on the Proctor Property stripped away the equity in that Property, and increased the mortgages on the Property by close to $117,000. Upon information and belief, the fees and other charges collected by Sussex in connection with this transaction were disbursed at the direction of Farahpour to Farahpour, Chaudhry and Norman.

134. The loans were closed and settled by Sussex. Sussex's role included the preparation of loan documents, a deed and disbursement checks by Chaudhry, the obtention of signatures to the various documents by Ballesteros. For the Simon Property, the scheme

stripped away the equity in that Property, and increased the mortgages on the Property by close to $100,000. Upon information and belief, the fees and other charges collected by Sussex in connection with this transaction were disbursed at the direction of Farahpour to Farahpour, Chaudhry and Norman.

141. As set forth above, Ballesteros, being paid by Chaudhry and Farahpour, participated by obtaining signatures to deeds and loan documents for loans made to straw purchasers. Chaudhry prepared ([or] had prepared under his supervision) Deeds and Deeds of Trust, signed checks and authorized disbursement of funds. Farahpour participated through the use of his entity Money Tree Funding by dividing up the funds received from these transactions to himself, Chaudhry and Norman.

After appellees filed the class action suit, Norman's business partners filed a claim against the class representatives in the United States District Court for the District of Maryland, alleging that they were the masterminds behind the enterprise. *Proctor v. Metro. Money Store Corp.*, 645 F.Supp.2d 464, 490–92 (D.Md.2009). The claim was dismissed. *Id.* at 492. Norman's business partners also sought dismissal of the second amended complaint which the federal court likewise denied. *Id.* Chaudhry then filed a Rule 11 [6] motion, alleging

---

**6.** FRCP 11(b) states, in relevant part:

By presenting to the court a pleading, written motion, or other paper—... an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending ... [existing law] ...;

(3) the factual contentions have evidentiary support ...;

(4) the denials of the factual contentions are warranted....

FRCP 11(c)(2) provides that a party may file a motion for sanctions for a violation of FRCP 11(b).

that counsel (i) failed to conduct a reasonable inquiry into the facts before filing the complaints, and (ii) advanced "false factual claims" despite knowing that the allegations were not true. The court rejected these claims, finding them "totally devoid of merit" and concluding that there was "significant documentary evidence to support the allegations."

### The Defamation Action

On June 18, 2007, Chaudhry received a phone call from a reporter at the Baltimore Sun newspaper ("Sun"). The reporter indicated that Sussex had been named as a defendant in a class action suit filed in circuit court.[7] On June 19, 2007, the Sun published an article describing the lawsuit. Robinson was quoted in the article as stating: "It's statewide, and it's at least a couple hundred people. . . ." The article also stated that Robinson said that state as well as federal agencies, including the FBI, were investigating. Holland was quoted in the article as stating: "We're talking about bad people . . . [a] mortgage foreclosure rescue scam is worse than predatory lending. They know equity is in the house and they come at you like vultures," and "[t]hey're stealing not only the equity, but title and possession, too." The article did not specifically mention Norman.

On July 12, 2007, the Washington Post newspaper ("Post") published an article concerning the class action suit filed in circuit court. Robinson was quoted in the article as stating: "The sole motive seemed to be to enrich their lavish lifestyles as opposed to saving the homes of vulnerable homeowners from foreclosure." The Post article was republished in full in the Maryland Daily Record newspaper on July 13, 2007. Again, the article did not specifically mention Norman.

On or about July 13, 2007, the Post ombudsman contacted Norman to speak on behalf of Sussex. On July 14, 2007, the Post quoted Norman as indicating that Sussex reported the

---

7. The circuit court complaint was dismissed before the parties were served.

scam to the FBI months ago, and that Sussex had also been a victim of the fraud.

On July 24, 2007, appellees dismissed the circuit court action in order to file the action in the United States District Court. On July 25, 2007, the Sun published a second article. The article identified Sussex as a named defendant in the complaint. Chaudhry was quoted, on behalf of Sussex, as denying the charges and claiming "that a fraud was perpetrated on the company." Robinson and Borison were also quoted in the article. Borison was quoted as stating: "As we kept investigating the case, it became clear that there were also federal charges to be asserted.... Metropolitan Money Store was out stealing the equity in people's homes and on top of that, getting it tax free." The article did not contain any statements that specifically mentioned Norman.

At some point, Borison and the Legg Law Firm created a website on the World Wide Web,[8] www.metromoneystore.com.

---

8. The Court of Appeals recently quoted the Supreme Court's description of the World Wide Web in *Independent Newspapers, Inc. v. Brodie*, 407 Md. 415, 422 n. 1, 966 A.2d 432 (2009) (quoting *Reno v. ACLU*, 521 U.S. 844, 852–53, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)):

"The best known category of communication over the Internet is the World Wide Web, which allows users to search for and retrieve information stored in remote computers, as well as, in some cases, to communicate back to designated sites. In concrete terms, the Web consists of a vast number of documents stored in different computers all over the world. Some of these documents are simply files containing information. However, more elaborate documents, commonly known as Web "pages," are also prevalent. Each has its own address—"rather like a telephone number." Web pages frequently contain information and sometimes allow the viewer to communicate with the page's (or "site's") author. They generally also contain "links" to other (generally) related sites. Typically, the links are either blue or underlined text—sometimes images.
Navigating the Web is relatively straightforward. A user may either type the address of a known page or enter one or more keywords into a commercial "search engine" in an effort to locate sites on a subject of interest. A particular Web page may contain information sought by the "surfer," or, through its links, it may be an avenue to other documents located anywhere on the Internet. Users generally explore a given Web page, or move to another, by clicking a computer "mouse" on one of the page's icons or links. Access to most Web pages is freely available, but some allow access only to those who

The website lists the other appellees and provides links to their law firms. Appellees published PDF[9] versions of the original federal complaint, the first amended complaint, the second amended complaint, and a federal indictment on the site. The indictment does not name Norman, Norman's former partners, or Sussex.[10] Although Norman is identified by name in the second amended complaint, to which the site provides access, Norman is not mentioned anywhere else on the site.

On June 18, 2008, Norman, Sussex, Chaudhry, and Farahpour filed a complaint for defamation in the Circuit Court for Montgomery County. In November 2008, the defamation complaint came to the attention of the federal court during a hearing on Chaudhry and Farahpour's Rule 11 motion against appellees concerning the class action litigation. The court stated: "I find that the litigation brought by Messrs. Chaudhry and Farahpour in the Circuit Court for Montgomery County is patently intended to interfere with the jurisdiction of this court and to chill attorneys before this court and I simply will not tolerate it." Thereafter, Chaudhry and Farahpour dismissed their defamation claims in the circuit court.

On January 5, 2009, Norman filed a second amended complaint in the circuit court. The complaint consisted of fourteen counts for defamation, negligence, civil conspiracy, and injurious falsehood. The complaint alleged that appellees

have purchased the right from a commercial provider. The Web is thus comparable, from a reader's viewpoint, to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services." (Footnote omitted).

**9.** PC Magazine's Online Encyclopedia of Internet Terminology defines Portable Document Format, or PDF, as "the de facto standard for document publishing from Adobe." http://www.pcmag.com/encyclopedia/ (last visited March 24, 2010). Adobe is the name of the leading multimedia and desktop software publishing company. *Id.*

**10.** Norman argues that the PDF versions of the complaints are incomplete versions because they do not include the accompanying exhibits. We note that they were accurate and fail to see how incompleteness causes harm to Norman.

defamed Norman by circulating copies of the state and federal complaints to a newspaper reporter, the internet, and by speaking to a reporter. The complaint also singled out certain statements by individual appellees. Appellees moved to dismiss the complaint.

On February 19, 2009, the court held a hearing on appellees' motion to dismiss and took the matter under advisement. On February 20, 2009, the court issued an order dismissing Norman's complaint with prejudice. The order first noted that "[o]verall, there is no allegation in any of the counts of any 'falsity,' a required element of defamation." The order then dismissed the following counts based on absolute privilege:

1) Count I (Publishing the state complaint to the Baltimore Sun);

2) Count III (Publishing the state complaint to the Washington Post);

3) Count V (Publishing the federal complaint to the Baltimore Sun);

4) Count VII (Publishing the federal complaint on the internet);

5) Count VIII (Publishing the first amended complaint on the internet);

6) Count IX (Publishing the second amended complaint on the internet);

7. Count X (Appellee Borison's reply to Chaudhry's Rule 11 Motion); and

8) Count XI (Appellee Borison's opposition to notice of sale claims by the estate).

With regard to the above eight counts, the order stated that "Maryland law makes no distinction between internet press and written press.... Additionally [Norman] has no standing because he is not a named party to the aforementioned suit."

The court dismissed the following counts because Norman "has no standing to allege the [ ] causes of action:"

1) Count II (Appellee Holland's 6/19/07 defamation to the Sun);

2) Count IV (Appellee Robinson's 7/12/07 defamation to the Post); and

3) Count VI (Defendant Borison's 7/25/07 defamation to the Sun).

The court dismissed Count XII (Negligence) for failure to state a cause of action under Maryland law. Count XIII (Injurious falsehood) and Count XIV (Civil conspiracy) were dismissed as duplicitous.

Norman appeals from the order, but does not challenge dismissal of Counts IV, XII, XIII or XIV.

## DISCUSSION

### Standard of Review

Under Maryland Rule 2–322(b)(2), a party may seek dismissal of a complaint if the complaint fails to state a claim upon which relief can be granted. The standard for reviewing the grant of a motion to dismiss is whether the circuit court was legally correct. *Sprenger v. Pub. Serv. Comm'n of Md.,* 400 Md. 1, 21, 926 A.2d 238 (2007) (citations omitted). In reviewing the grant of a motion to dismiss, the appellate court "must determine whether the complaint, *on its face,* discloses a legally sufficient cause of action." *Pittway Corp. v. Collins,* 409 Md. 218, 234, 973 A.2d 771 (2009) (emphasis in original). The Court must "presume[ ] the truth of all well-pleaded facts in the [c]omplaint, along with any reasonable inferences derived therefrom in a light most favorable to plaintiffs." *Id.* (citation omitted). Also, "[i]t is well established in Maryland that, in an appeal from a final judgment, the appellate court may affirm the court's decision on any ground adequately shown by the record." *State v. Rush,* 174 Md.App. 259, 289, 921 A.2d 334 (2007) (citations omitted), *aff'd in relevant part,* 403 Md. 68, 939 A.2d 689 (2008).

## I. Standing

 Standing is a threshold issue; a party may proceed only if he demonstrates that he has a real and justiciable interest that is capable of being resolved through litigation. *Mayor & City Council of Ocean City v. Purnell–Jarvis Ltd.,* 86 Md.App. 390, 403, 586 A.2d 816 (1991). In order to have standing, a party must demonstrate an "injury-in-fact," or "an actual legal stake in the matter being adjudicated." *Hand v. Mfrs. & Traders Trust Co.,* 405 Md. 375, 399, 952 A.2d 240 (2008) (citation omitted). Appellees argue that Norman does not have standing to maintain suit for defamation because he has not identified any false and defamatory statements made against him. Norman counters that he has standing because the defamatory remarks made by appellees directly named and referred to him by virtue of his position with Sussex.

Norman heavily relies on *Goldborough v. Orem & Johnson,* 103 Md. 671, 64 A. 36 (1906), to establish his standing to sue. He argues that the law does not require that defamatory remarks specifically identify an individual, as long as the remarks are "of and concerning" that person, and that appellees' defamatory statements were intended to apply to him. In *Goldborough,* the defendant published a defamatory letter in a local newspaper accusing "the vestry" of various conduct. *Id.* at 674, 64 A. 36. The vestry consisted of eight people. *Id.* at 673, 64 A. 36. The Court found:

> [I]f the words spoken, or written though plain in themselves apply equally well to more persons than one, evidence may be given both of the cause and occasion of the publication, and of all the surrounding circumstances affecting the relation between the parties. The plaintiff may call at the trial his friends, or those acquainted with the circumstances, to state that on reading the libel they at once concluded it was aimed at the plaintiff.

*Id.* at 682, 64 A. 36 (citation and quotation marks omitted). *See also Foley v. Hoffman,* 188 Md. 273, 287, 52 A.2d 476 (1947) (stating that although defamatory remarks did not

name plaintiff, reference to his position as "chief clerk" was sufficient to identify him as the subject of the remarks).

Norman admits that Maryland courts have since been silent on the "of and concerning issue" and refers us to cases in other jurisdictions to bolster his argument. He first argues that other courts have expanded the "of and concerning" requirement. *See, e.g., Croixland Props. Ltd. P'ship v. Corcoran,* 174 F.3d 213, 216 (C.A.D.C.1999) (the "of and concerning" test is satisfied if the listener or reader concludes the alleged comment refers to the plaintiff "even if the plaintiff is never named or misnamed") (citations omitted); *Mullenmeister v. Snap–On Tools Corp.,* 587 F.Supp. 868, 872–73 (S.D.N.Y. 1984) (stating that it is not required that "all the world" understand the defamatory remark, but only those who know the plaintiff and are familiar with the circumstances of the situation) (citation omitted).

Norman also argues that the case law from other jurisdictions demonstrates that, the smaller the company, the more likely the court will find that the defamation pertained to plaintiffs. *See Marr v. Putnam,* 196 Or. 1, 246 P.2d 509, 521 (1952) (finding defamation of a small company that was not named met the "of and concerning" test requirement as to two owners of a small business who set forth evidence that friends understood the defamatory comments to refer to them); *but see Jankovic v. Int'l Crisis Group,* 494 F.3d 1080, 1089–90 (D.C.Cir.2007) (concluding that "of and concerning" test was not met because plaintiff was the owner of a "global enterprise"). Finally, Norman argues that courts in other jurisdictions give great weight to the plaintiff's role in the company, *see Caudle v. Thomason,* 942 F.Supp. 635, 638 (D.D.C.1996), and require less stringent proof of a clear reference to an individual when the defamatory remarks are more severe. *Jankovic v. Int'l Crisis Group,* 429 F.Supp.2d 165, 175 (2006), *aff'd in relevant part,* 494 F.3d 1080.

We begin our analysis by noting that Norman has not identified any defamatory statements made about him individually; rather they were, as described by appellees, a

description of Norman's business relations with the company he owned. It is a "well settled policy" in Maryland that a company, large or small, is a separate entity from its owners and shareholders, and the rights and responsibilities of the company are separate and distinct from those of its owners and shareholders. *Stein v. Smith,* 358 Md. 670, 682, 751 A.2d 504 (2000). As such, where the company holds a right of action in tort, this right does not extend to the company's owners, just as a cause of action that belongs to an owner individually would not extend to the company. *See Mona v. Mona Elec. Group, Inc.,* 176 Md.App. 672, 698, 934 A.2d 450 (2007) ("[O]rdinarily, a shareholder does not have standing to sue to redress injury to a corporation.") (Citation omitted); *Superior Outdoor Signs, Inc. v. Eller Media Co.,* 150 Md.App. 479, 500, 822 A.2d 478 (2003). We can extrapolate from this general rule that the defamation of a company does not create a cause of action for its shareholders or owners.[11] *See Nat'l Shutter Bar Co. v. G.F.S. Zimmerman & Co.,* 110 Md. 313, 318, 73 A. 19 (1909) (stating that publication must refer to the person being defamed), *overruled on other grounds by Cranson v. Int'l Bus. Machs. Corp.,* 234 Md. 477, 200 A.2d 33 (1964).

We next examine the *Goldborough* Court's analysis and holding, and note that *Goldborough* did not concern the alleged defamation of a company or corporation and did not address whether the owner of a company would have standing to sue for damages arising from the alleged defamation of the company. *Goldborough, supra,* 103 Md. at 682, 64 A. 36. We will not expand the scope of the "of and concerning" test enunciated in *Goldborough.* Indeed, if this Court were to regard the defamation claims by a company and its owners as interchangeable, the "of and concerning" test would override longstanding principles of corporate law. We will not chip

---

11. Federal courts have also held the converse to be true. *See Novick v. Hearst Corp.,* 278 F.Supp. 277, 279–80 (D.Md.1968) (citations omitted) (stating that corporations do not have standing to sue for allegedly defamatory statements made about their stockholders, officers, or employees).

away at the basic precept that corporations and individuals are legally separate entities.[12]

Furthermore, Norman's blanket assertion that the owners of Sussex are defamed because Sussex is defamed, ignores the fact that the complaint attributes acts to *specific* former employees and owners of Sussex. As appellees point out, Norman cannot lump the allegedly defamatory comments made about other individuals into a "common pot." In other words, even if this Court were to agree with Norman that defamatory comments made against a small company can also apply to its owners, the second amended complaint did not only refer to Sussex, but made reference to three individuals, to wit, Chaudhry, Farahpour, and Ballesteros. The second amended complaint also refers numerous times to "defendants"—a group that specifically *excludes* Norman, because he was not named as a defendant.

For the foregoing reasons, Norman does not have standing to pursue a cause of action for defamation against appellees.[13]

## II. Absolute Privilege

 Even if we were to assume that Norman does have standing to sue appellees for defamation, the circuit court was still correct in dismissing the case because the allegedly defamatory statements are protected by absolute privilege. In a defamation case, the existence of a privilege is a question of law for the court. *Gohari v. Darvish*, 363 Md. 42, 73–74, 767 A.2d 321 (2001). "Absolute judicial privilege applies to statements contained in pleadings, affidavits, or other documents directly related to the case." *Offen v. Brenner*, 402 Md.

---

12. The Court of Appeals recently reiterated the general rule that members of an LLC are not liable for "torts committed by, or contractual obligations acquired by, the LLC." *Allen v. Dackman*, 413 Md. 132, 152, 991 A.2d 1216 (2010) (citations omitted).

13. We also note that Norman's case against Carney presents unique standing issues. Carney was no longer working at The Holland Law Firm and was not representing the class action plaintiffs when the second amended complaint was filed and posted on the website.

191, 200, 935 A.2d 719 (2007) (quoting *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 403–04, 494 A.2d 200 (1985)) (additional citations and quotation marks omitted). The privilege is "broad and comprehensive" and applies irrespective of whether the statements contain erroneous allegations of fact. *Keys, supra*, 303 Md. at 404, 494 A.2d 200. It is relevant to our analysis that Maryland courts have accepted the "minority, or 'English' rule which afford[s] the absolute privilege to witnesses and parties without the necessity of demonstrating the relevance of the statement to the pending litigation." *Id.* (citation omitted). Nevertheless, "for the privilege to apply, the statement must be made to further a purpose falling within the public interest underlying the privilege, i.e. the unfettered disclosure of information needed for a judicial or quasi-judicial decision-making process." *Woodruff v. Trepel*, 125 Md.App. 381, 399, 725 A.2d 612 (1999). The privilege "is not an absolute and unqualified privilege and cannot be extended beyond the reason and principles on which it was founded." *Maulsby v. Reifsnider*, 69 Md. 143, 152, 14 A. 505 (1888).

Norman cites *Kennedy v. Cannon*, 229 Md. 92, 98–99, 182 A.2d 54 (1962), to support his position that appellees' comments to the press are not protected by the privilege. *Kennedy* concerned an attorney's oral communications to the press. *Id.* at 94, 182 A.2d 54. Plaintiffs sued the attorney for defamation, alleging that the "words spoken by [the attorney] to the newspaper charged [a married woman] with adultery, were slanderous *per se* ... and were not privileged." *Id.* The Court found that the judicial proceeding had commenced, but noted that "this does not necessarily mean that every statement made by an attorney after the inception of a judicial proceeding will be privileged." *Id.* at 97, 182 A.2d 54. The Court held that the absolute privilege did not attach to the attorney's statements and commented that "an attorney who wishes to litigate his case in the press will do so at his own risk." *Id.* at 99, 182 A.2d 54.

We must first state that the facts of *Kennedy* diverge so greatly from the facts of this case that it is difficult to compare

the two cases. In *Kennedy*, the attorney's client was a black man accused of raping a married white woman on Maryland's eastern shore in the late 1950s or early 1960s. *Id.* at 94, 182 A.2d 54. The attorney, fearing that his client would be lynched, called the press and claimed that the intercourse was consensual. *Id.* at 95, 182 A.2d 54. Appellees here did not make any comments to the newspaper that were both slanderous *per se* and directly identified Norman. Second, the attorney in *Kennedy* had not filed any pleadings or papers with the court at the time he made the defamatory comments to the newspaper. *Id.* at 94, 182 A.2d 54. Essentially, the attorney called and made the initial slanderous remarks in the press in defense of his client.[14] That is not the case here. The appellees were not attempting to set up a slanderous defense to the allegation of rape or some other crime in the press.

■■■ Norman next argues that the republication of the complaints on the World Wide Web voided the absolute privilege. This argument lacks merit as well. We explain.

In addition to citing again *Kennedy* to support his position, Norman refers us to *Woodruff, supra,* 125 Md.App. 381, 725 A.2d 612. In *Woodruff,* an attorney sent his client a letter which "clearly 'had relation' to the child custody proceedings" and was therefore privileged. *Id.* at 394, 725 A.2d 612. The letter was subsequently republished to the principal of the child's school. *Id.* at 389, 725 A.2d 612. This Court ultimately held:

> We glean from our review of [ ] prior Maryland decisions that, for the privilege to apply, the statement must be made to further a purpose falling within the public interest underlying the privilege.... The requirement that there be adequate procedural safeguards to protect the interests of

---

14. The *Kennedy* Court stated that "the means [the attorney] chose to fulfill [the] duty [to his client] were not proper" and that "[o]ther steps ... were open to [the attorney]," such as "a request for change of venue, *voir dire* examination of prospective jurors in regard to the article, and preservation of the question of the prejudicial effect of the article, for appellate review." *Kennedy, supra,* 229 Md. at 100, 182 A.2d 54.

the individual who may be defamed comes into play largely as part of the determination of whether the allegedly defamatory statement was made in a judicial or quasi-judicial proceeding. In the circumstances presented in the instant case, we find neither a furtherance of the purpose of the privilege nor adequate procedural safeguards to protect appellant, who was the subject of the letter.

*Id.* at 399, 725 A.2d 612.

In *Chinwuba v. Larsen*, 142 Md.App. 327, 790 A.2d 83 (2002), *rev'd on other grounds*, 377 Md. 92, 832 A.2d 193 (2003), this Court declined to apply the absolute litigation privilege to statements that the sitting Maryland Insurance Commissioner made to the press which were published in the Baltimore Sun and the Washington Post. *Id.* at 346, 790 A.2d 83. This Court held that the privilege did not apply because the statements were "made to an entity with no conceivable role" in the judicial process, did not serve any judicial purpose, and because "informal press contacts provide[ ] absolutely no procedural safeguard that would minimize the prospect of defamatory statements." *Id.* at 394–95, 790 A.2d 83 (citations omitted).

Norman analogizes his case to *Kennedy, Woodruff,* and *Chinwuba,* and argues that there were inadequate procedural protections because he did not have the "opportunity to present his side of the story" when the incomplete PDF versions of the complaint were republished on the internet. However, *Kennedy* and *Chinwuba* involved extra-judicial statements and *Woodruff* involved a letter, whereas this case involves a complaint. The Court of Appeals has been clear that a complaint is a public document and "[t]he common law rule that court proceedings, records, and documents are open to the public is fully applicable in Maryland...." *Balt. Sun Co., v. Mayor & City Council of Balt.,* 359 Md. 653, 662, 755 A.2d 1130 (2000); *see also Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (noting the common law right to inspect and copy judicial records); *Rosenberg v. Helinski,* 328 Md. 664, 679, 616 A.2d 866 (1992) (holding that judicial proceedings are public events and "what transpires in

the court room is public property") (citation omitted). The law does not distinguish based on where, or in what manner, a public document is viewed. In fact, the Maryland General Assembly has directed that the public should have an unfettered right to examine the original, or any copy, of a public document. Md.Code (1984, 2009 Repl.Vol.), State Government Article §§ 10–612 & 10–613. The Maryland Rules of Professional Conduct plainly apply this legislative direction to court proceedings by allowing attorneys to state the claim offense, defense, and persons involved in a complaint as well as "information contained in public record." MRPC 3.6(b).[15]

The holdings in *Kennedy, Woodruff,* and *Chinwuba* do not apply where the republication is of a complaint or other public document. To date, Maryland courts have not held that redistribution or dissemination of pleadings to parties outside the judicial process will void privileged status, and we likewise decline to do so. In the circumstances of this particular case, we conclude that posting complaints on the internet, which merely regurgitate those filed in court, does not void their privileged status. Additionally, appellant ignores the fact that *Kennedy, Woodruff,* and *Chinwuba* were not class action cases. In this case, the federal court judge handling the class action litigation expressly permitted the use of the internet to communicate with class action litigants. Websites can also be helpful in class action suits to inform and identify potential class members. This Court will not interfere with the federal court's handling of the class action litigation in that regard.

For all the foregoing reasons, we affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

**15.** We cite the Maryland Rules of Professional Conduct as a reference to provide additional support. In so doing, we do not suggest that compliance with the MRPC will shield a defendant from defamation claims.